## In re NYSE SPECIALISTS SECURITIES LITIGATION

No. 03 Civ. 8264(RWS).

United States District Court, S.D. New York.

Dec. 13, 2005.

Lerach Coughlin Stoia Geller Rudman & Robbins, San Diego, CA (William S. Lerach, Mark Solomon, Byron S. Georgiou, William J. Doyle, II, Brian O. O'Mara, Lucas F. Olts), of counsel, Lovell Stewart Halaebian, New York, NY (Christopher Lovell, Victor E. Stewart, Writer C. Clayton, James M. Bekier, of counsel), for Plaintiffs.

Fried, Frank, Harris, Shriver & Jacobson, New York, NY (Debra M. Torres, of counsel), for New York Stock Exchange.

Morgan, Lewis & Bockius, New York, NY (Robert M. Romano, John M. Vassos, of counsel), for Bear Wagner Specialists and Bear Stearns & Co.

Davis Polk & Wardwell, New York, NY (Lawrence Portnoy, of counsel), for Fleet-Boston Financial Corp.; Fleet Specialist, Inc.; Bank of America Corp. and Quick & Reilly, Inc.

Weil, Gotshal & Manges, New York, NY (Irwin H. Warren, Stephen A. Radin, of counsel) for LaBranche & Co., Inc. and LaBranche & Co. LLC.

Katten Muchin Zavis Rosenman, New York, NY (E. Michael Bradley, of counsel), for George M.L. LaBranche, IV.

Dickstein Shapiro Morin & Oshinsky, Washington, DC, and New York, NY (Howard Schiffman, Alexander D. Widell, of counsel), for Performance Specialist Group LLC.

Wilmer Cutler Pickering Hale and Dorr, New York, NY (Robert B. McCaw, Robert W. Trenchard, of counsel) for Spear, Leeds & Kellogg Specialists LLC; Spear, Leeds & Kellogg, LP., Goldman, Sachs & Co., and the Goldman Sachs Group, Inc.

King & Spalding, New York, NY (Richard A. Cirillo, Paul A. Straus, of counsel), Wolf, Block, Schorr & Solis–Cohen, Philadelphia, PA, (M. Norman Goldberger, Nathan E. Kase, Andrew C. Curley, of counsel), for SIG Specialists, Inc. and Susquehanna International Group, LLP.

Sullivan & Cromwell, New York, NY (Robert J. Giuffra, Jr., Stacey R. Friedman, of counsel), for Van der Moolen Holding, NV.

Friedman Kaplan Seiler & Adelman, New York, NY (Katherine L. Pringle, Robert S. Loigman, Melissa E. London, of counsel), for Van der Moolen Specialists USA, LLC.

## OPINION

SWEET, District Judge.

LaBranche & Co., LLC ("LaBranche LLC"), LaBranche & Co., Inc. ("LaBranche & Co."), George M.L. LeBranche, IV ("M.LaBranche"), Spear, Leeds & Kellogg Specialists LLC ("Spear Leeds LLC"), Spear, Leeds & Kellogg, LP ("Spear Leeds LP"), Goldman Sachs & Co., Inc. ("Goldman Sachs & Co."), The Goldman Sachs Group, Inc. (the "Goldman Sachs Group"), Van der Moolen Specialists USA, LLC ("VDM Specialists"), Van der Moolen Holding, NV ("VDM Holding"), Fleet Specialist, Inc. ("Fleet Specialist"), FleetBoston Financial Corp. ("FleetBoston Corp."), Bank of America Corp. ("Bank of America"), Quick & Reilly, Inc. ("Quick & Reilly"), Bear Wagner Specialists LLC ("Bear Wagner LLC"), Bear Stearns & Co., Inc. ("Bear Stearns & Co."), SIG Specialists, Inc. ("SIG Specialists"), Susquehanna International Group, LLP ("SIG LLP"), Susquehanna Financial Group, LLP (Susquehanna), and Performance

Specialist Group, LLC ("Performance Specialist") (collectively, the "Specialist Defendants")[1] have moved pursuant to Rules 12(b)(6) and 9(b), Fed.R.Civ.P., to dismiss Plaintiffs' Consolidated Complaint ("the Complaint"). Defendant New York Stock Exchange ("NYSE")[2] has moved to dismiss the Complaint pursuant to Rule 12(b)(6). Lead Plaintiffs California Public Employees' Retirement System ("CalPERS") and Empire Programs, Inc. ("Empire") (collectively, the "Plaintiffs") have moved to modify the discovery stay set forth in Section 21D(b)(3)(B) of the Securities Exchange Act of 1934, as amended by the Private Securities Litigation Reform Act of 1995 (the "PSLRA"), 15 U.S.C. § 78u–4(b)(3)(b).

For the reasons set forth below, the motions to dismiss of the Specialist Defendants are granted in part and denied in part. The motion of NYSE to dismiss is granted. To the extent that claims have not been dismissed with prejudice, leave is granted to replead within thirty (30) days of the entry of this opinion.

### Prior Proceedings

On October 17, 2003, this action was initiated by Pirelli Armstrong Tire Corporation Retiree Medical Benefits Trust, which filed a complaint (03 Civ. 8521) on behalf of itself and all others similarly situated. On November 11, 2003, Empire filed its complaint (03 Civ. 8935). On December 16, 2003, CalPERS filed its complaint (03 Civ. 9968). On March 16, 2004, Rosenbaum Partners, LP filed a complaint (04 Civ.2038) in its individual capacity. By

Opinion dated May 27, 2004, the above-referenced actions were consolidated for all purposes under docket number 03 Civ. 8264, CalPERS and Empire were appointed as lead plaintiffs, and lead counsel was selected. *See Pirelli Armstrong Tire Corp. v. LaBranche & Co., Inc.*, 229 F.R.D. 395 (S.D.N.Y.2004). A Consolidated Complaint (the "Complaint") was filed on September 17, 2004. On November 16, 2004, the Specialist Defendants moved to dismiss the Complaint pursuant to Rules 9(b) and 12(b)(6), Fed.R.Civ.P. On November 17, 2004, the NYSE moved to dismiss the Complaint pursuant to Rule 12(b)(6). Pursuant to a briefing schedule agreed to by the parties, these motions were heard and marked fully submitted on April 13, 2005.

A motion to modify the PSLRA discovery stay was filed by the Plaintiffs on October 1, 2004. This motion was heard and marked as fully submitted on November 17, 2004.

### The Parties

CalPERS is the largest public employee retirement system in the United States, with assets of over $166 billion and nearly 1.4 million beneficiaries, including active and retired public employees. CalPERS is alleged to have purchased and/or sold almost three billion shares of NYSE-listed stock between October 17, 1998 and October 15, 2003 (the "Class Period").

Empire is a New Jersey corporation that has its principal place of business in Saddle River, New Jersey. Empire is al-

---

1. There are three relevant subsets within the Specialist Defendants. First, LaBranche LLC, Spear Leeds LLC, VDM Specialists, Fleet Specialist, Bear Wagner LLC, SIG Specialists, and Performance Specialist are referred to collectively as the "Specialist Firms." Second, LaBranche & Co., Spear Leeds LP, Goldman Sachs & Co., the Goldman Sachs Group, VDM Holding, FleetBo-

ston Corp., Bank of America, Quick & Reilly, Bear Stearns & Co., SIG LLP, and Susquehanna are referred to collectively as the "Affiliated Companies." Third, SIG Specialists, SIG LLP, and Susquehanna are referred to collectively as the "SIG Defendants."

2. NYSE and the Specialist Defendants are referred to collectively as the "Defendants."

leged to have purchased and/or sold over four billion shares of NYSE-listed stock during the Class Period.

The NYSE is a not-for-profit corporation organized under the laws of New York State.[3] Pursuant to the Exchange Act, it is registered with the SEC as a national stock exchange. Each of the specialist firms and their individual employee specialists are members of the NYSE.

LaBranche LLC, is a registered broker-dealer with the SEC and an NYSE member organization. LaBranche LLC is the largest NYSE specialist firm, serving as a specialist for more than 600 companies listed on the NYSE. During the Class Period, LaBranche LLC accounted for about 29% of the annual trading volume on the NYSE. The parent company of LaBranche LLC is LaBranche & Co. M. LaBranche is the Chairman, President, and CEO of LaBranche & Co., and he has served as a LaBranche LLC specialist since 1977. During the Class Period, he served as a Special Governor of the NYSE, in which capacity he was charged with overseeing the trading activities of the specialist firms, and he was a member of the NYSE Market Performance Committee.

Spear Leeds LLC is an NYSE specialist firm and a registered broker-dealer. Spear Leeds LLC is a subsidiary of parent company Spear Leeds LP, which is a wholly owned subsidiary of the Goldman Sachs Group. Spear Leeds LLC is the second largest specialist firm on the NYSE, serving as a specialist for the stocks of more than 550 NYSE-listed companies and accounting for about 20% of the annual trading on the NYSE during the Class Period. Spear Leeds LLC is affiliated with Gold-

man Sachs & Co., which is a member firm of the NYSE.

VDM Specialists is an NYSE specialist firm responsible for trading in the stocks of more than 370 public companies listed on the NYSE. During the Class Period, VDM Specialists accounted for about 12.5% of the annual trading volume on the NYSE. Van der Moolen Holding is the parent company of VDM Specialists.

Fleet Specialist is an NYSE specialist firm that is responsible for trading in more than 430 NYSE-listed companies. It accounted for some 18% percent of the NYSE's annual trading volume during the Class Period. Since April 1, 2004, the parent company of Fleet Specialist has been Bank of America. Prior to that time, Fleet Specialist' parent company was FleetBoston Corp., which merged with Bank of America. Quick & Reilly is a member of the NYSE and an affiliate of Fleet Specialist and Bank of America. Prior to its merger with Bank of America, FleetBoston Corp. was the parent of Quick & Reilly.

Bear Wagner LLC is a member of the NYSE and a registered broker-dealer that operates as an NYSE specialist. Bear Wagner LLC acts as specialist for more than 340 NYSE-listed stocks and accounted for some 16% of the NYSE's annual trading volume during the Class Period. Bear Stearns & Co. is a member of the NYSE and is the broker-dealer affiliate of Bear Wagner LLC.

SIG Specialists is a member of the NYSE and a wholly owned subsidiary of SIG LLP. SIG Specialists is a registered broker-dealer that operates as an NYSE

---

**3.** The NYSE recently voted to approve a merger with Archipelago Holdings, which will transform the NYSE from a not-for-profit entity to a publicly traded company next year. See Jenny Anderson, *Big Board–Archipelago Deal Approved by Wide Margin*, N.Y. Times, Dec. 7, 2005, at C3. However, at all times relevant to this complaint, the NYSE was a not-for-profit organization.

specialist firm. SIG Specialists is responsible for trading in more than 150 NYSE listed stocks and accounted for some 3% of the NYSE trading volume during the Class Period. Susquehanna, a member organization of the NYSE, is affiliated with SIG Specialists and SIG LLP.

Performance Specialist, a member of the NYSE, is a registered broker-dealer that operates as a NYSE specialist. Performance Specialist is responsible for the trading of more than 165 NYSE-listed stocks. During the Class Period, it accounted for some 1.5% of the NYSE's annual trading volume.

### The Action

This is a securities class action brought on behalf of public investors who purchased and/or sold shares listed on the New York Stock Exchange ("NYSE") during the Class period, for which specialist firms were responsible for maintaining the trading market. The Consolidated Complaint (the "Complaint") alleges that Defendants violated the Securities Exchange Act of 1934 (the "Exchange Act") and violated the fiduciary duty owed to the class members, and/or aided and abetted the breach of such duty.

Count One of the Complaint asserts that all Defendants violated Section 10(b) of the Exchange Act and Rule 10b–5 promulgated thereunder. Count Two asserts that all Defendants violated Section 20(a) of the Exchange Act. Count Three asserts that NYSE violated Section 6(b) of the Exchange Act. Count Four asserts that all Defendants breached the fiduciary duty owed to the Plaintiffs and/or aided and abetted the breach of such duty. Count Five asserts that Spear Leeds LP, Goldman Sachs & Co., Quick & Reilly, Bear Stearns, and Susquehanna breached fiduciary duties owed to the Plaintiffs.

### The Role Of The NYSE Specialist

The Complaint involves allegations that the specialist firms of the NYSE violated their legal duties to investors, thereby causing injury. In order to assess the sufficiency of these allegations, an understanding of the function and obligations of the specialist firms is necessary.

The purchase and sale of securities on the NYSE must be carried out by a specialist who works on the floor of the exchange.[4] Each security listed for trading on the NYSE is assigned to a particular specialist. To execute purchases and sales of a particular security, buyers and sellers must present their bids to buy, and offers to sell, to the specialist assigned to the security. These orders could be brought to a specialist in one of two ways. First, the order could be conveyed orally and in person to the specialist by a floor broker on the floor of the exchange. Second, an order could be transmitted to the specialist electronically using the NYSE's Super Designated Order Turnaround System ("Super DOT"). Orders transmitted over the Super DOT system would appear on a special computer screen often referred to as the "display book."[5] Each specialist has a computerized "display book" screen at his or her trading post.

After receipt of an order, a specialist could execute the order in two different

---

**4.** The description that follows of the role of specialists largely reflects the allegations contained in the April 2005 indictments referred to below. *See* 05 Cr. 390–398.

**5.** The SEC Order explained that "[t]he Display Book is an electronic workstation provided by the NYSE.... The Display Book allows specialists to ... receive and process orders, disseminate trade and quote information, report trade executions, research order and execution status, manage positions and view profit and loss in the dealer account." (SEC Order, 2004 WL 626573, at *12 n. 3.)

manners. Generally, orders were executed in the "agency" or "broker" manner, in which the specialist was required to match any open orders to buy from one investor with an open order to sell from another investor within the same price range. Specialists generally received no compensation for filling orders on an agency basis.

Second, specialists were permitted to execute, in certain limited circumstances, trades on a "principal" or "dealer" basis, when required to do so to maintain a fair and orderly market. In such circumstances, such as if there were no matching orders to sell and orders to buy, the specialist was permitted to execute an investor's order to buy stock by selling the stock from the specialist's proprietary account, or "inventory" of stock, to the investor. Additionally, the specialist was permitted to execute an investor's order to sell stock by buying that stock and holding the stock in the investor's inventory.

A respected treatise provides the following description of the duties performed by the NYSE specialist:

> The specialist firm occupies a unique dual role in the operation of the New York Stock Exchange, which is also the case with the other securities exchanges. First, a specialist firm acts as a "broker's broker," maintaining a "book" on which other brokers can leave customers' "limit orders" (i.e., orders to buy or sell at a price at which they cannot currently be executed). Second, a specialist acts as the exclusive franchised dealer, or "market maker" in its assigned stocks, buying and selling shares from other brokers when there are no customer orders on its book against which they can be matched.

> The functions of the specialist can be illustrated by the following example. A firm is the specialist in an actively-traded stock, in which the market is $40 to $40.10. This means that customer orders are on the specialist's book to buy specified numbers of shares at $40 or less, and other orders are on his book to sell at $40.10 or more (for historical reasons, shares formerly were quoted in halves, quarters and eighths, rather than cents but now are traded in decimals). A broker who comes to the specialist with an order to sell "at the market" will sell to the customer with the first buy order on the book at $40, and a broker who comes with a market order to buy will buy from the customer with the first sell order on the book at $40.10. The specialist acts solely as a subagent, receiving a portion of the "book" customer's commission to his broker.

> Now assume the same firm is also the specialist in an inactively traded stock. The only orders on the book are an order to buy at $38 and an order to sell at $42. If the specialist acted solely as agent, a broker who came in with a market order to sell would receive $38, and another broker who came in an hour later with a market order to buy would pay $42. The report of these two trades on the "tape" would indicate the stock had risen 4 points, or 10%, in an hour. The exchange therefore imposes an obligation on the specialist to maintain an "orderly market" in his assigned stocks, buying and selling for his own account to even out swings which would result from buyers and sellers not appearing at his post at the same time. In this case he might make his market at $40 to $40.25, trading for his own account as long as necessary, but yielding priority to customers' orders on his book whenever they provide as good a price to the party on the other side.

In essence, exchange trading and the specialist system is based on a "continuous two-way agency auction market" in

which the firms acting as specialists "are responsible for the quality of the markets" for the securities in which they specialize. The specialist's obligation is also phrased in terms of the duty to maintain a fair and orderly market. The SEC has explained that a fair and orderly market is one that is not marred by manipulation or deception and characterized by reliable price continuity.

Specialists on an exchange are viewed as having two primary duties: to secure the best execution of orders with "minimal dealer intervention" and at the same time to manage supply and demand imbalances. Specialists carry out these obligations by participating in the market both as a broker or agent in acting as an intermediary between two matching orders and also as a dealer or principal when there is no available counter party to the transaction. Thus, specialists should not interposition themselves between matching offsetting orders. In other words, specialists may obtain the best execution by matching transactions and crossing customer orders. In fact, it is the specialist's obligation to do so if possible.

4 Thomas Lee Hazen, *Law of Securities Regulation* § 14.11[1][C] (5th ed.2005).

### NYSE Rules Governing the Conduct of Specialists

NYSE Rule 104 places a negative obligation on specialists by prohibiting a specialist from trading for his own account unless it is reasonably necessary to maintain a fair and orderly market. Rule 104 states in relevant part: "No specialist shall effect ... purchases or sales of any security in which such specialist is registered ... unless such dealings are reasonably necessary to permit such specialist to maintain a fair and orderly market."

NYSE Rule 92, as amended, provides that "no member or member organization shall cause the entry of an order to buy (sell) any Exchange-listed security for any account in which such member or member organization ... is directly or indirectly interested (a 'proprietary order'), if the person responsible for the entry of such order has knowledge of any particular unexecuted customer's order to buy (sell) such security which could be executed at the same price." Rule 92 also applies to the specialist buying or selling a security while holding an unexecuted customer market buy or sell order, as well as to circumstances where the specialist holds unexecuted customer limit orders at a price that could be satisfied by the proprietary transaction effected by the specialist.

NYSE Rule 123B (Exchange Automated Order Routing Systems) requires specialists to cross orders received over the DOT system. Rule 123B(d) states in relevant part: "a specialist shall execute System orders in accordance with the Exchange auction market rules and procedures, including requirements to expose orders to buying and selling interest in the trading crowd and to cross orders before buying or selling from his own account."

NYSE Rule 401 requires NYSE member organizations to "adhere to the principles of good business practice in the conduct of his or its business affairs." Similarly, NYSE Rule 476(a)(6) provides sanctions if NYSE member organizations engage in conduct "inconsistent with just and equitable principles of trade." Pursuant to NYSE Rule 476(a)(7), member organizations must also refrain from engaging in "acts detrimental to the interest or welfare of the Exchange."

NYSE Rule 342 provides that "[e]ach office, department or business activity of a member or member organization ... shall

be under the supervision and control of the member or member organization establishing it and of the personnel delegated such authority and responsibility."

### The Allegations

The following facts are drawn from the Complaint and do not constitute findings of the Court.

Seven specialist firms—LaBranche LLC, Spear Leeds LLC, Van der Moolen Specialist, Fleet Specialist, Bear Wagner LLC, SIG Specialists, and Performance Specialist—handle the trading in stocks for all of the NYSE's more than 2,800 listed companies. The approximate share of the NYSE annual trading volume handled by each of these defendants during the Class Period is as follows:

| Firm | % NYSE Annual Volume |
| --- | --- |
| LaBranche LLC | 29% |
| Spear Leeds LLC | 20% |
| VDM Specialists | 12.5% |
| Fleet Specialist | 18% |
| Bear Wagner LLC | 16% |
| SIG Specialists | 3% |
| Performance Specialist | 1.5% |

The stock of each of the approximately 2,800 companies listed on the NYSE is assigned by the NYSE to one of these seven specialist firms. Only one specialist can be designated for a given stock listed on the NYSE, although a given specialist firm may handle more than one stock.

It is alleged that the Specialist Defendants engaged generally in the following illegal practices: (1) interpositioning (see Compl. ¶¶ 76–82 (defining interpositioning as "taking advantage of the spread between the bid and offer prices by buying stock from one public investor, and then selling it to another, locking in a guaranteed, riskless profit")); (2) trading ahead (see id. ¶¶ 83–90 (defining trading ahead as filling public orders from a specialist's own firm accounts ahead of orders received from customers)); (3) freezing the book (see id. ¶¶ 91–104 (defining freezing the book as improperly facilitating proprietary trading by freezing the NYSE Display Book and thereby halting customer interaction and trading)); (4) manipulating the tick (see id. ¶¶ 105–09 (defining manipulating the tick as asking or signaling a member in the crowd to purchase part of a public offer so that the specialist could then, under NYSE rules, engage in proprietary trading)); and (5) falsifying trade reports (see id. ¶¶ 110–26 (describing how certain specialist firms falsified NYSE-mandated weekly reports concerning proprietary trading)).

### A. The SEC/NYSE Investigation

On March 30, 2004, the Securities and Exchange Commission ("the SEC") announced that: (1) pursuant to Section 15(b)(4) and 21C of the Exchange Act, it had instituted administrative and cease-and-desist proceedings against LaBranche LLC, Spear Leeds LLC, VDM Specialists, Fleet Specialist, Bear Wagner LLC, SIG Specialists, and Performance Specialist; and (2) these seven firms had all settled the SEC and NYSE investigations. Pursuant to this settlement, the specialist firms agreed to pay more than $240 million in penalties and disgorgement. The allegations with respect to each of the Specialist Defendants are summarized below.

### 1. LaBranche LLC

The SEC and NYSE determined that between January 1999 and 2003, LaBranche LLC engaged in interpositioning, trading ahead, and non-execution of limit orders. Such practices resulted in customer disadvantage of $41,646,440. Of this total, $8,689,574 of customer disadvantage was the result of interpositioning,

$30,969,236 was the result of trading ahead, and $1,987,630 was the result of non-execution of limit orders.

The SEC and NYSE determined that some 41% of LaBranche LLC's customer disadvantage from interpositioning occurred in just six stocks—Nokia, Lucent Technologies Inc., Morgan Stanley, Tyco International Ltd., Compaq Computer Corp., and Merck & Co. Inc. Furthermore, it was determined that the interpositioning violations with respect to certain transactions in these stocks were done by certain LaBranche LLC specialists with scienter.

The SEC and NYSE determined that certain senior executives at LaBranche LLC knew about the illicit trading because certain of the LaBranche LLC specialists who were engaged in such interpositioning in these six stocks were senior executives at LaBranche LLC, including managing directors, post managers, and a floor captain, some of whom had supervisory responsibility for LaBranche LLC's trading activities on the NYSE floor.

The SEC and NYSE observed that between January 2000 and July 2003, the NYSE issued five separate fines to La-Branche LLC or certain of its specialists for instances of trading ahead. Furthermore, the NYSE issued an 2001 examination report to LaBranche LLC that noted a "multitude" of instances in which a La-Branche LLC specialist had traded ahead of customer orders. In February 2003, the NYSE issued LaBranche LLC an admonition letter for excessive freezing of the Display Book in late 2002.

Based on these determinations (which were neither admitted nor denied), La-Branche LLC agreed to pay $41,646,440 in disgorgement and $21,872,320 in civil penalties.

### 2. *Spear Leeds LLC*

The SEC and NYSE determined that from January 1999 through 2003, Spear Leeds LLC engaged in interpositioning, trading ahead and intentional non-execution of limit orders and that such practices resulted in customer disadvantage of $28,776,072. Of this total, $8,309,962 of customer disadvantage was the result of interpositioning, $19,430,004 was the result of trading ahead, and $1,036,106 was the result of non-execution of limit orders.

The SEC and NYSE determined that some 76% of Spear Leeds LLC's customer disadvantage from interpositioning occurred in just six stocks—AOL Time Warner, International Business Machines Corporation, Micron Technology, Inc., American International Group, Inc., Teradyne, Inc., and Verizon Communications Inc. The interpositioning violations with respect to certain transactions in these six stocks were done by certain Spear Leeds LLC specialists with scienter.

The SEC and NYSE determined that certain Spear Leeds LLC senior executives knew about the illicit trading because certain of the specialists who were engaged in some of the most egregious cases of improper conduct were among the most senior executives at Spear Leeds LLC, including managing directors and team captains.

In June 2002, the NYSE issued a $1,000 fine to a Spear Leeds LLC predecessor because five of its specialists had specialists traded ahead.

The SEC and NYSE determined that between 1999 and 2003, trading ahead of unexecuted limit orders by Spear Leeds LLC caused $1,036,106 in customer disadvantage.

Based on these determinations (which were neither admitted nor denied), Spear

Leeds LLC paid $28,776,072 in disgorgement and $16,496,406 in civil penalties.

### 3. *VDM Specialists*

The SEC and NYSE determined that from January 1999 through 2003, VDM Specialists engaged in interpositioning, trading ahead, and intentional non-execution of limit orders and that such conduct resulted in $34,926,613 of customer disadvantage. Of this total, $14,629,743 of customer disadvantage was caused by interpositioning, $19,209,087 was the result of trading ahead, and $1,087,783 was the result of non-execution of limit orders.

The SEC and NYSE determined that some 80% of VDM Specialists' customer disadvantage from interpositioning occurred in just six stocks—Nortel Networks Corporation, Pfizer Inc., Hewlett–Packard Company, Time Warner Inc., The Walt Disney Company, and Eli Lilly & Co. Interpositioning in Nortel Networks alone accounted for some 29% of this disadvantage. The SEC and NYSE determined that the interpositioning in these six stocks was done with scienter.

The SEC and NYSE determined that certain members of VDM Specialists' management committee engaged in interpositioning in one or more of the six stocks listed above, and these members of the management committee had the supervisory responsibility for the firm's trading operations on the NYSE floor, including supervising a floor captain who himself engaged in such interpositioning in one or more of the six stocks.

The NYSE and SEC observed that in 2001, the NYSE had provided VDM Specialists with an examination report showing that the firm had traded ahead and disadvantaged customer orders. In 2002, the NYSE provided VDM Specialists with an examination report that identified additional instances of trading ahead. Senior

management at VDMS received these reports and reviewed them with NYSE staff.

Based on these determinations (which were neither admitted nor denied), VDM Specialists agreed to pay $34,926,613 in disgorgement and $22,748,491 in civil penalties.

### 4. *Fleet Specialist*

The SEC and NYSE determined that from January 1999 through 2003, Fleet Specialist engaged in interpositioning, trading ahead and intentional non-execution of limit orders, and that such practices resulted in $38,013,594 of customer disadvantage. Of this total, $9,797,398 of customer disadvantage was caused by interpositioning, $26,969,830 was caused by trading ahead, and $1,246,366 was caused by non-execution of limit orders.

Some 80% of Fleet Specialist' customer disadvantage from interpositioning occurred in just six stocks—General Electric Company, Goldman Sachs Group Inc., Applera–Celera Genomics, JP Morgan Chase & Co., Charles Schwab Corp., and Johnson & Johnson. General Electric Company alone accounted for more than 61% of this customer disadvantage. The SEC and NYSE determined that these interpositioning transactions were done with scienter.

The SEC and NYSE determined that in 2001 and 2002, senior managers at Fleet Specialist received internal reports of specific instances of improper conduct by certain specialists.

The SEC and NYSE observed that in February 2002, the NYSE had issued an admonition letter to Fleet Specialist noting that between October 2000 and April 2001, certain of its specialists had effected transactions for Fleet Specialist' dealer account while in possession of previously entered agency orders on the same side of the

market, resulting in inferior price executions of such agency orders.

Based on these determinations (which were neither admitted nor denied), Fleet Specialist agreed to pay $38,013,594 in disgorgement and $21,083,875 in civil penalties.

### 5. *Bear Wagner LLC*

The SEC and NYSE determined that from January 1999 through 2003, Bear Wagner LLC engaged in interpositioning, trading ahead, and intentional non-execution of limit orders and that such conduct resulted in $10,724,903 of customer disadvantage. Of this total, $2,074,303 of customer disadvantage was caused by interpositioning, $8,085,348 was caused by trading ahead, and $565,252 was caused by the non-execution of limit orders.

Some 68% of Bear Wagner LLC's customer disadvantage from interpositioning occurred in just six stocks—Texas Instruments Inc., Motorola Inc., Merrill Lynch & Co. Inc., Citigroup Inc., EMC Corp./Massachusetts, and Corning Inc. The SEC and NYSE determined that these interpositioning transactions were done with scienter.

The SEC and NYSE noted that a February 2002 examination by the NYSE identified several instances where a Bear Wagner LLC specialist appeared to have traded ahead of an executable customer order. A December 2002 examination by the NYSE identified 33 additional instances where Bear Wagner LLC specialists appeared to have traded ahead of executable customer orders.

Based on these determinations (which were neither admitted nor denied), Bear Wagner LLC agreed to pay $10,724,903 in disgorgement and $5,534,543 in civil penalties.

### 6. *SIG Specialists*

The SEC and NYSE determined that from January 1999 through 2003, SIG Specialists engaged in interpositioning, trading ahead, and the non-execution of limit orders and that such conduct resulted in $2,045,571 of customer disadvantage. Of this total, $282,983 of customer disadvantage was caused by interpositioning, $1,684,525 was caused by trading ahead, and $78,063 was caused by the non-execution of limit orders.

Some 86% of SIG Specialists' customer disadvantage from interpositioning occurred in just six stocks—Analog Devices, Inc. ("ADI"), Solectron Corp., Ensco International Inc., Lexmark International, Inc., Calpine Corp., and L–3 Communications Holdings, Inc. ADI alone accounted for more than 32% of SSI's overall customer disadvantage from interpositioning. The SEC and NYSE determined that certain of these interpositioning transactions were done with scienter.

Based on these determinations (which were neither admitted nor denied), SIG Specialists agreed to pay $2,045,571 in disgorgement and $988,018 in civil penalties.

### 7. *Performance Specialist*

The SEC and NYSE determined that from January 1999 through 2003, Performance Specialist engaged in interpositioning and trading ahead that resulted in $1,491,171 of customer disadvantage. Of this total, $140,488 of customer disadvantage was caused by interpositioning, $1,283,098 was caused by trading ahead, and $67,585 was caused by non-execution of limit orders.

Some 78% of Performance Specialist overall customer disadvantage from interpositioning occurred in just six stocks— Sony Corp. ("SNE"), Safeguard Scientifics, Inc., CBS Corp., Illinois Tool Works, Infin-

ity Broadcasting Corp., and GTE Corp. SNE alone accounted for more than 34% of this customer disadvantage from interpositioning. The SEC and NYSE determined that these interpositioning transactions were done with scienter.

The SEC and NYSE noted that certain of the specialists who were engaged in such interpositioning in these six stocks were also senior executives with supervisory responsibilities for PSG's trading activities on the NYSE floor.

Based on these determinations (which were neither admitted nor denied), SIG Specialists agreed to pay $1,491,171 in disgorgement and $680,761 in civil penalties.

## B. Allegations Contained In The April 2005 Indictments

In April 2005, a grand jury in this district handed down criminal indictments against certain current and former individual specialists at the NYSE alleging violations of 15 U.S.C. §§ 78j(b) and 78ff and 17 C.F.R. § 240.10b–5. Since the information contained in these indictments can be judicially noticed by this Court, *see Ives Labs., Inc. v. Darby Drug Co.*, 638 F.2d 538, 544 n. 8 (2d Cir.1981), these materials will be considered in connection with this motion. *See Kramer v. Time Warner Inc.*, 937 F.2d 767, 773 (2d Cir.1991).

### 1. LaBranche LLC (United States v. Deboer (05 Crim. 396))

The above-referenced indictment alleges that from March 2000 through April 2003, LaBranche LLC specialist Freddy DeBoer ("DeBoer") caused 7,710 instances of interpositioning, which resulted in profits of $770,000. During this same period, DeBoer is alleged to have engaged in 11,620 instances of trading ahead, which resulted in $3,280,000 in customer harm. Such conduct is alleged to have included trades that involved shares of Nokia Corporation, Lehman Brothers Holdings, Inc., and Celestica Inc.

### 2. Spear Leeds LLC (United States v. Johnson (05 Crim. 392))

The above-referenced indictment alleges that from October 2000 through April 2003, Spear Leeds specialist Robert A. Johnson, Jr. ("Johnson") caused over 6,390 instances of interpositioning, which resulted in illegal profits of $350,000. During this same period, Johnson is alleged to have engaged in 4,740 instances of trading ahead, which resulted in more than $380,000 in customer harm. Such conduct is alleged to have included trades that involved shares of Verizon Communications, Inc. and Bell Atlantic.

### 3. VDM Specialists (United States v. Bongiorno et al. (05 Crim. 390))

The above-referenced indictment alleges that between January 1999 and April 2003, VDM specialists Joseph Bongiorno ("Bongiorno"), Patrick McGagh ("McGagh"), Michael Hayward ("Hayward"), Michael Stern ("Stern"), Richard Volpe ("Volpe"), Robert Scavone ("Scavone"), and Gerard Hayes ("Hayes") engaged in a scheme to trade ahead of customer orders and also to interposition proprietary trades between such orders. The specific allegations with respect to each of these VDM specialists are summarized below.

| Specialist | Instances of Interpositioning And Improper Profits Derived | Instances of And Trading Ahead And Resulting Customer Harm | Specific Stocks Referenced |
|---|---|---|---|

| | | | |
|---|---|---|---|
| Bongiorno | 15,620 instances ($1,380,000) | 8,630 instances ($1,360,000) | Hewlett–Packard Company |
| McGagh | 21,290 instances ($3,430,000) | 4,200 instances ($1,240,000) | Nortel Networks Corp.; Pfizer Inc. |
| Hayward | 5,210 instances ($690,000) | 5,000 instances ($1,190,000) | Apache Corp.; SPX Corporation; Time Warner Inc. |
| Stern | 3,980 instances ($400,000) | 5,250 instances ($630,000) | Duke Energy Corp.; Kohls Corp.; Eli Lilly and Company |
| Volpe | 13,730 instances ($790,000) | 5,270 instances ($600,000) | The Walt Disney Company; Pfizer Inc. |
| Scavone | 3,710 instances ($197,000) | 4,540 instances ($330,000) | Eli Lilly and Company |
| Hayes | 2,280 instances ($150,000) | 5,710 instances ($570,000) | International Paper Co.; The Walt Disney Co. |

4. *Fleet Specialist (United States v. Foley (05 Crim. 391); United States v. Murphy (05 Crim. 397); United States v. Hunt (05 Crim. 395); and United States v. Finnerty (05 Crim. 393))*

The above-referenced indictments allege that from January 1999 to April 2003, Fleet Specialist Donald R. Foley, II ("Foley"), Thomas J. Murphy, Jr. ("Murphy"), Scott G. Hunt ("Hunt"), and David Finnerty ("Finnerty") engaged in separate schemes to trade ahead of customer orders and also to interposition proprietary trades between such orders. The allegations with respect to each of these Fleet Specialist are summarized in the following table.

| Specialist | Instances of Interpositioning And Improper Profits Derived | Instances of And Trading Ahead And Resulting Customer Harm | Specific Stocks Referenced |
|---|---|---|---|
| Foley | 3,710 instances ($310,000) | 8,910 instances ($1,800,000) | Chase Manhattan Bank; JP Morgan Chase |
| Murphy | 3,160 instances ($140,000) | 6,560 instances ($590,000) | Johnson & Johnson; Electronic Data Systems |
| Hunt | 1,910 instances ($150,000) | 6,120 instances ($940,000) | The Goldman Sachs Group, Inc.; Cardinal Health Inc. |
| Finnerty | 25,850 instances ($4,360,000) | 15,380,000 ($5,000,000) | General Electric Company; Apple– Celera Genomics; PE Biosystems |

5. *Bear Wagner LLC (United States v. Fee (05 Crim 398); United States v. Delaney (05 Crim. 394))*

The above-referenced indictments allege that between November 2000 and April 2003 Fleet Specialist Kevin M. Fee ("Fee") and Frank A. Delaney, IV ("Delaney") engaged in separate schemes to trade ahead of customer orders and also to interposition proprietary trades between such orders. The allegations concerning these two specialists are summarized in the table below.

| Specialist | Instances Of Interpositioning And Improper Profits Derived | Instances Of And Trading Ahead And Resulting Customer Harm | Specific Stocks Referenced |
|---|---|---|---|
| Fee | 1,150 instances ($170,000) | 1,310 instances (740,000) | Texas Instruments Inc. |
| Delaney | 2,030 instances ($180,000) | 1,510 instances ($390,000) | Merrill Lynch & Co., Inc.; Bank One |

## C. *Allegations Concerning NYSE*

Plaintiffs assert that the NYSE and the Specialist Defendants worked together to engage in a scheme to defraud investors who traded on the NYSE. Plaintiffs contend that the NYSE actively participated in this scheme by working with the specialists to engage in improper trading activity and to evade the regulatory scrutiny that would have prevented such conduct.

It is alleged that NYSE knew that the Specialist Defendants were violating the Exchange Act and NYSE's rules by trading ahead and interpositioning. It is further alleged that NYSE deliberately failed to oversee its exchange or discipline its member for rules violations. Instead, NYSE allegedly exercised its regulatory authority over the Specialist Defendants in a constrained manner.

More specifically, NYSE officials are alleged to have tipped off the Specialist Defendants about impending investigations, thereby permitting the Specialist Defendants to conceal their illegal trading practices. It is also alleged that NYSE officials falsified trading data by approving trade records that they knew to be false. The NYSE Division of Market Surveillance allegedly helped the Specialist Defendants identify incriminating documentation and advised them how to alter data in order to hide evidence of wrongdoing.

The Complaint also alleges that NYSE made statements that created the "public impression that the NYSE was overseeing and operating its exchange in accordance with laws, regulations and its own rules." (Compl.¶ 139.) These statements, which are catalogued in Appendix 2 below, are alleged to be false and misleading.

The Complaint alleges that NYSE's conduct was motivated by the direct financial interest of NYSE and its top executives. The alleged components of this direct financial interest include higher trading volume and increased trading fee revenue for NYSE, higher market value for seats on the NYSE, increased NYSE enterprise value, increased NYSE listings, and increased levels of compensation for NYSE senior executives.

The NYSE announced on April 12, 2005 that it had entered into a settlement agreement with the SEC, consenting to various remedial undertakings and an order of censure by the SEC, without admitting or denying any factual allegations.

*Standards*

**A. *Rule 12(b)(6), Rule 9(b), and the PSLRA***

Defendants have moved for dismissal of the Complaint pursuant to Fed.R.Civ.P. 12(b)(6), 9(b), and the PSLRA. In considering a motion to dismiss pursuant to Rule 12(b)(6), the Court construes the complaint liberally, "accepting all factual allegations in the complaint as true, and drawing all reasonable inferences in the plaintiff's favor." *Chambers v. Time Warner, Inc.,* 282 F.3d 147, 152 (2d Cir.2002) (citing *Gregory v. Daly,* 243 F.3d 687, 691 (2d Cir.2001)).

On a Rule 12(b)(6) motion to dismiss, "mere conclusions of law or unwarranted deductions" need not be accepted. *First Nationwide Bank v. Gelt Funding Corp.,* 27 F.3d 763, 771 (2d Cir.1994). Furthermore, the truth of factual allegations that are contradicted by documents properly considered on a motion to dismiss need not be accepted. *See e.g., Rapoport v. Asia Elecs., Holding Co.,* 88 F.Supp.2d 179, 184 (S.D.N.Y.2000). The following materials may be considered on a Rule 12(b)(6) motion:

(1) facts alleged in the complaint and documents attached to it or incorporated in it by reference, (2) documents "integral" to the complaint and relied upon in it, even if not attached or incorporated by reference, (3) documents or information contained in defendant's motion papers if plaintiff has knowledge or possession of the material and relied on it in framing the complaint, (4) public disclosure documents required by law to be, and that have been, filed with the Securities and Exchange Commission, and (5) facts of which judicial notice may properly be taken under Rule 201 of the Federal Rules of Evidence.

*In re Merrill Lynch & Co., Inc.,* 273 F.Supp.2d 351, 356–57 (S.D.N.Y.2003) (footnotes omitted).

"The issue is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims." *Villager Pond, Inc. v. Town of Darien,* 56 F.3d 375, 378 (2d Cir.1995) (quoting *Scheuer v. Rhodes,* 416 U.S. 232, 236, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974)). In other words, " 'the office of a motion to dismiss is merely to assess the legal feasibility of the complaint, not to assay the weight of the evidence which might be offered in support thereof.' " *Eternity Global Master Fund Ltd. v. Morgan Guar. Trust Co. of New York,* 375 F.3d 168, 176 (2d Cir.2004) (quoting *Geisler v. Petrocelli,* 616 F.2d 636, 639 (2d Cir.1980)). Dismissal is only appropriate when "it appears beyond doubt that the plaintiff can prove no set of facts which would entitle him or her to relief." *Sweet v. Sheahan,* 235 F.3d 80, 83 (2d Cir.2000); *accord Eternity Global Master Fund,* 375 F.3d at 176–77.

A claim under section 10(b) sounds in fraud and must therefore meet the pleading requirements of Rule 9(b), Fed. R.Civ.P. *See, e.g., In re Scholastic Corp. Sec. Litig.,* 252 F.3d 63, 69–70 (2d Cir. 2001). Such a claim must also satisfy certain requirements of the PSLRA. *See* 15 U.S.C. §§ 78u–4(b)(1) & 78u–4(b)(2); *see generally Novak v. Kasaks,* 216 F.3d 300, 306–07 (2d Cir.2000) (setting forth the heightened pleading standards of the PSLRA that must be met by a plaintiff who alleges securities fraud under Section 10(b) and Rule 10b–5); *Shields v. Citytrust Bancorp, Inc.,* 25 F.3d 1124, 1127 (2d Cir. 1994) (stating that "[s]ecurities fraud allegations under § 10(b) and Rule 10b–5 are

subject to the pleading requirements of Rule 9(b)").

Rule 9(b) provides that "[i]n all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity. Malice, intent, knowledge, and other condition of mind of a person may be averred generally." Fed.R.Civ.P. 9(b). The Second Circuit "has read Rule 9(b) to require that a complaint [alleging fraud] '(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent.'" *Rombach v. Chang,* 355 F.3d 164, 170 (2d Cir.2004) (quoting *Mills v. Polar Molecular Corp.,* 12 F.3d 1170, 1175 (2d Cir.1993)).

■ In particular, the plaintiff must allege facts that "give rise to a strong inference of fraudulent intent." *Novak,* 216 F.3d at 307. The Second Circuit has stated that this scienter requirement can be satisfied:

> "'either (a) by alleging facts to show that defendants had both motive and opportunity to commit fraud, or (b) by alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness.'"

*Acito v. IMCERA Group, Inc.,* 47 F.3d 47, 52 (2d Cir.1995) (quoting *Shields v. Citytrust Bancorp, Inc.,* 25 F.3d 1124, 1128 (2d Cir.1994)).

Rule 8's general pleading requirement and Rule 9(b)'s particularity requirement must be read together. *See Ouaknine v. MacFarlane,* 897 F.2d 75, 79 (2d Cir.1990) (stating that "Rule 9(b) . . . must be read together with Rule 8(a) which requires only a 'short and plain statement' of the

claims for relief"); *Credit & Fin. Corp. v. Warner & Swasey Co.,* 638 F.2d 563, 566 (2d Cir.1981) (same); *In re Initial Pub. Offering Sec. Litig. ("IPO"),* 241 F.Supp.2d 281, 327 (S.D.N.Y.2003). These two rules have been read together to mean that a plaintiff need not plead evidentiary details. *See, e.g., id.* The Second Circuit has stated that it does "not require the pleading of detailed evidentiary matter in securities litigation." *Scholastic,* 252 F.3d at 72.[6] Courts of this district have stated that "the application of Rule 9(b) . . . must not abrogate the concept of notice pleading." *IPO,* 241 F.Supp.2d at 327 n. 46.

## B. Section 10(b) and Rule 10b–5

Section 10(b) of the Exchange Act provides in pertinent part as follows:

> It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails, or of any facility of any national securities exchange-
>
> . . . . .
>
> (b) To use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, or any securities-based swap agreement (as defined in section 206B of the Gramm–Leach–Bliley Act), any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.

15 U.S.C. § 78j.

Rule 10b–5 provides in pertinent part as follows: .

---

**6.** *See also Shaw v. Digital Equip. Corp.,* 82 F.3d 1194, 1225 (1st Cir.1996) (stating that "in determining the adequacy of a complaint under [Rule 9(b)], we cannot hold plaintiffs to a standard that would effectively require them, pre-discovery, to plead evidence").

It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange,

(a) To employ any device, scheme, or artifice to defraud,

(b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or

(c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

17 C.F.R. § 240.10b–5.

"The language of Section 10(b) and Rule 10b–5 does not explicitly create a private right of action. In fact, the legislative history fails to indicate whether Congress even contemplated creating such a right.... Nevertheless, courts long have held that a private right of action was indeed created." *Ontario Public Service Employees Union Pension Trust Fund v. Nortel Networks Corp.*, 369 F.3d 27, 31 (2d Cir.2004).

■ To state a claim under Section 10(b) and Rule 10b–5 a plaintiff must plead that the defendant: "(1) made misstatements or omissions of material fact; (2) with scienter; (3) in connection with the purchase or sale of securities; (4) upon which plaintiff[ ] relied; and (5) that plaintiff['s] reliance was the proximate cause of [the] injury." *In re Livent, Inc. Sec. Litig.*, 78 F.Supp.2d 194, 213 (S.D.N.Y.1999).

## C. *Section 20(a)*

Section 20(a) provides as follows:

Every person who, directly or indirectly, controls any person liable under any provision of this chapter or of any rule or regulation thereunder shall also be liable ... to the same extent as such controlled person ... unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action.

15 U.S.C. § 78t(a).

■ In order to plead control person liability under Section 20(a), a plaintiff must "allege a primary § 10(b) violation by a person controlled by the defendant and culpable participation by the defendant in the perpetration of the fraud." *Suez Equity Investors, L.P. v. Toronto–Dominion Bank*, 250 F.3d 87, 101 (2d Cir.2001) (holding that plaintiffs had stated a Section 20(a) claim against defendant bank where it was alleged that: (1) the person who had committed the alleged violation of Section 10(b) was an officer of the bank, and (2) the officer was responsible for the bank's relationship with a venture whose securities were the subject of the alleged Section 10(b) violation).

## D. *Section 6(b)*

Section 6(b) of the Exchange Act provides in pertinent part that:

An exchange shall not be registered as a national securities exchange unless the Commission determines that—

(1) Such exchange is so organized and has the capacity to be able to carry out the purposes of this chapter and to comply, and ... to enforce compliance by its members ... with the provisions of this chapter, the rules and regulations thereunder, and the rules of the exchange.

\* \* \* \* \* \*

(5) The rules of the exchange are designed to prevent fraudulent and manip-

ulative acts and practices, to promote just and equitable principles of trade, to foster cooperation and coordination with persons engaged in regulating, clearing, settling, processing information with respect to, and facilitating transactions in securities, to remove impediments to and perfect the mechanism of a free and open market and a national market system, and, in general, to protect investors and the public interest; and are not designed to permit unfair discrimination between customers, issuers, brokers, or dealers....

(6) The rules of the exchange provide that ... its members and persons associated with its members shall be appropriately disciplined for violation of ... the rules of the exchange....

15 U.S.C. § 78f(b).

### E. Common Law Breach of Fiduciary Duty

■■ Under New York law, the elements of a fiduciary duty claim are: (1) the existence of a fiduciary relationship, and (2) a breach of the duty arising from that relationship. *See, e.g., Official Comm. of Asbestos Claimants of G–I Holding, Inc. v. Heyman,* 277 B.R. 20, 37 (S.D.N.Y.2002). A fiduciary relationship may be found "when one [person] is under a duty to act for or to give advice for the benefit of another upon matters within the scope of the relation." *Flickinger v. Harold C. Brown & Co.,* 947 F.2d 595, 599 (2d Cir.1991) (citation omitted).

■ A claim for aiding and abetting a breach of fiduciary duty requires the plaintiff to prove "(1) the existence of a violation committed by the primary (as opposed to the aiding and abetting) party; (2) 'knowledge' of this violation on the part of the aider and abettor; and (3) 'substantial assistance' by the aider and abettor in achievement of the violation." *Briarpatch*

*Ltd. L.P. v. Geisler Roberdeau, Inc.,* No. 99 Civ. 9623, 2002 WL 31426207, at *7 (S.D.N.Y. Oct.30, 2002).

### Discussion

### A. The Claims Against NYSE Are Dismissed With Prejudice

NYSE has sought dismissal of the claims against it on the grounds that claims arising from NYSE's allegedly improper exercise of its regulatory authority are barred by a doctrine of absolute immunity. Plaintiffs argue that NYSE is not shielded by immunity for knowingly operating its auction market in a fraudulent manner.

### 1. The Section 6(b), 20(a), 10(b) Fraudulent Scheme, and State Law Aiding and Abetting Breach of Fiduciary Duty Claims

■ NYSE is registered with the SEC as a national securities exchange pursuant to Section 6 of the Exchange Act. *See* 15 U.S.C. § 78f. As such, it is a self-regulatory organization ("SRO") within the meaning of the Exchange Act. *See* 15 U.S.C. § 78c(a)(26). The Exchange Act delegates to NYSE, as an SRO, the authority to regulate its members and to enforce its members' compliance with the Exchange Act, the rules and regulations thereunder, and NYSE rules. *See* 15 U.S.C. § 78s(g)(1). The Exchange Act provides the SEC with broad and exclusive authority to oversee: (1) NYSE's compliance with the Exchange Act, the rules and regulations thereunder, and its own rules; and (2) NYSE's enforcement of its members compliance with these provisions. *See* 15 U.S.C. §§ 78s(g)(1) and 78s(h)(1). The Exchange Act also empowers the SEC to take adverse action against NYSE should it fail to fulfill these duties, including such far-reaching measures as a revocation of NYSE's registration as an SRO,

suspension for a period of up to 12 months, and censure. *Id.*

The Second Circuit has held that "the NYSE, when acting in its capacity as a[n] SRO, is entitled to immunity from suit when it engages in conduct consistent with the quasi-governmental powers delegated to it pursuant to the Exchange Act and the regulations and rules promulgated thereunder." *D'Alessio v. New York Stock Exch., Inc.* 258 F.3d 93, 106 (2d Cir.2001) (affirming dismissal of tort and contract claims asserted against NYSE by stock broker who alleged that he had been wrongly prosecuted and suspended from trading on the NYSE); *see also DL Capital Group, LLC v. Nasdaq Stock Market, Inc.,* 409 F.3d 93, 97 (2d Cir.2005) (holding Nasdaq absolutely immune from suit challenging manner in which Nasdaq publicly announced suspension or cancellation of trades); *MFS Sec. Corp. v. New York Stock Exch., Inc.,* 277 F.3d 613, 617 (2d Cir.2002) (holding NYSE immune from contract claim by securities firm that had been stripped of its NYSE membership); *Barbara v. New York Stock Exch., Inc.,* 99 F.3d 49, 50 (2d Cir.1996) (holding NYSE "absolutely immune from damages arising out of performance of its federally mandated conduct of disciplinary proceedings").

In so holding, the *D'Alessio* court reasoned that the NYSE, as an SRO, "stands in the shoes of the SEC in interpreting the securities laws for its members and in monitoring compliance with those laws.... [Therefore,] [t]he NYSE should be entitled to the "same immunity enjoyed by the SEC when it is performing functions delegated to it under the SEC's broad oversight authority." *D'Alessio,* 258 F.3d at 105; *see also DL Capital,* 409 F.3d at 97 (noting that "because the NYSE performs a variety of regulatory functions that would, in other circumstances, be performed by [the SEC] ... the NYSE

should ... out of fairness be accorded full immunity from suits for money damages).

In *D'Alessio,* it was alleged that in order to generate revenue from trading practices that it knew to be illegal, the NYSE had: (1) disseminated interpretations of federal securities law and NYSE rules that it knew to be false; (2) failed to properly monitor the trading practices of floor brokers; and (3) provided false information to the SEC and the United States Attorney's Office. *Id.* at 106. The *D'Alessio* court determined that:

> [t]he NYSE's alleged improper interpretation of the type of conduct prohibited under section 11(a) falls within the NYSE's "quasi-public adjudicatory" duties. Similarly, the NYSE acted in its adjudicatory capacity when it determined that [plaintiff] D'Alessio was guilty of violating section 11(a) and various rules of the NYSE and suspended him from further trading on the NYSE floor. Because these actions "share the characteristics of the judicial process," *Barbara,* 99 F.3d at 59 (quotation marks omitted), the NYSE is entitled to immunity from suit for claims based on these actions. In charging D'Alessio with misconduct and referring his case to the United States Attorney's Office and the SEC, the NYSE exercised its authority pursuant to its "quasi-prosecutorial" function. *Finally, any malfeasance on the part of the NYSE in failing to monitor D'Alessio's and other floor brokers' compliance with the prohibition under section 11(a) plainly falls within the scope of the quasi-governmental duties delegated to the NYSE under the Exchange Act.*

*Id.* at 106 (emphasis added).

Here, Plaintiffs' allegations that NYSE deliberately failed to supervise and discipline the specialist firms (*see, e.g.,* Compl. ¶¶ 5, 8, 188, 193, 227, 228) are indistin-

guishable from those dismissed in *D'Alessio*. Plaintiffs argue that the two cases are distinguishable on the grounds that in the present case, it is alleged that NYSE's misconduct was motivated by non-regulatory business considerations (*i.e.*, the desire to maximize the compensation of NYSE executives and the revenues of NYSE members) that were not present in *D'Alessio*. This argument ignores the fact that the *D'Alessio* complaint alleged that the NYSE's misconduct had been motivated, at least in part, by an interest in the substantial fees earned by the NYSE and by a desire to increase NYSE's daily volume of trading activity. *Id.* at 98. As in *D'Alessio*, the NYSE's alleged misconduct falls within the scope of its quasi-governmental authority.

Plaintiffs also attempt to distinguish the Second Circuit's prior decisions concerning the absolute immunity of SRO's on the grounds that those cases involved suits by current or former members of the NYSE and not those brought by customers of the exchange. However, as stated by the *D'Alessio* court, NYSE's entitlement to immunity hinges solely on whether the alleged conduct giving rise to the claim was quasi-governmental in nature. *Id.* at 106. Neither the nature of the plaintiff's relationship with the SRO nor the nature of the plaintiff's claims are relevant to this analysis. As the Second Circuit recently reaffirmed: "This Court has never suggested that the identity of the plaintiff is what drives the absolute immunity analysis. Rather, we have made clear that it is the SRO's *function* as a quasi-governmental authority that entitles it to absolute immunity." *DL Capital*, 409 F.3d at 99

(citing *D'Alessio* at 104–05) (emphasis in original).

Finally, it should be noted that the Second Circuit's recognition of this absolute immunity was motivated, in large measure, by an interest in ensuring that the " 'exercise of [SROs'] quasi-governmental functions would [not] be unduly hampered by disruptive and recriminatory lawsuits.' " *Id.* at 105 (quoting *D'Alessio v. New York Stock Exch., Inc.*, 125 F.Supp.2d 656, 658 (S.D.N.Y.2000)).

Based on the foregoing, it is determined that NYSE has absolute immunity with respect to Plaintiffs' Section 6(b), Section 20(a), Section 10(b) fraudulent scheme, and state law fiduciary duty claims, all of which are based on NYSE's failure to adequately monitor the conduct of the Specialist Defendants. Therefore, these claims are dismissed with prejudice with respect to NYSE.

## 2. *The Section 10(b) Fraudulent Statement Claims*

█ Plaintiffs have also alleged that statements by NYSE concerning NYSE's duties to its customers were false and misleading in violation of section 10(b). Some of these statements appear primarily promotional in nature. (*See, id.* ¶¶ 140–43, 145, 147 150–53 [7]). Such statements would not appear to be protected by NYSE's absolute immunity for quasi-governmental functions.

However, Plaintiffs lack standing to assert a Section 10(b) claim based on the statements identified in the Complaint. The Second Circuit has held that standing to assert a fraudulent misrepresentation claim pursuant to Section 10(b) and Rule

---

**7.** The Complaint does not identify in what type of document the statement in paragraph 153 appeared. However, the text is promotional in tone. Moreover, with respect to this statement, NYSE has failed to carry its burden of demonstrating that it is entitled to immunity from suit. *See D'Alessio*, 258 F.3d at 104 (citing *Butz v. Economou*, 438 U.S. 478, 506, 98 S.Ct. 2894, 57 L.Ed.2d 895 (1978)).

10b–5 is limited to plaintiffs " 'who have at least dealt in the security to which the prospectus, representation, or omission relates.' " *Ontario Pub. Serv. Employees Union Pension Trust Fund v. Nortel Networks Corp.,* 369 F.3d 27, 32 (2d Cir.2004)[8] (quoting *Blue Chip Stamps v. Manor Drug Stores,* 421 U.S. 723, 747, 95 S.Ct. 1917, 44 L.Ed.2d 539 (1975) (applying *Birnbaum v. Newport Steel Corp.,* 193 F.2d 461 (2d Cir.1952))), *cert. denied sub nom. Visnic v. Nortel Networks Corp.,* 543 U.S. 1050, 125 S.Ct. 919, 160 L.Ed.2d 771 (2005).

Here, the representations at issue do not relate to any particular security, or to any security purchased or sold by any of the Plaintiffs. Rather, the alleged misstatements all concern NYSE's capacity to operate an efficient securities market. Under *Nortel,* Section 10(b) confers no standing on Plaintiffs to challenge statements such as these, *i.e.,* statements by a non-issuer about a non-issuer. *See Nortel,* 369 F.3d at 33.

Citing *Blue Chip Stamps,* 421 U.S. 723, 95 S.Ct. 1917, 44 L.Ed.2d 539, Plaintiffs argue that in order to have standing under Section 10(b) and Rule 10b–5, they merely must be purchasers or sellers of the securities that are the subject of the action. This argument was considered and rejected by the *Nortel* court, which stated:

> [Plaintiffs] claim that they have met the *Blue Chip Stamps* standing requirements because they purchased the security at issue in their lawsuit. They base this argument on the references in Section 10(b) and Rule 10b–5 to fraudulent conduct "in connection with the purchase or sale of *any* security." 15 U.S.C. § 78j(b), 17 C.F.R. § 240.10b–5

(emphasis added). In plaintiffs' view, the word "any" indicates that the intent of Congress and the SEC was to create universal standing for purchasers of securities, allowing anyone who made use of the markets to sue under Rule 10b–5. They further argue that this interpretation is consistent with the Supreme Court's understanding that Congress intended Section 10(b) to be interpreted flexibly to protect against the ever-evolving nature of securities fraud. *Affiliated Ute Citizens v. United States,* [406 U.S. 128, 151, 92 S.Ct. 1456, 31 L.Ed.2d 741] (1972).

> Plaintiffs assume that the phrase "any security" includes securities of any company affected in some way by the misrepresentation and not just securities of the company that makes the material misstatements. However, in our view, the phrase indicates that the regulations reach *all types* of securities, and not *any affected company's* securities. *See* Thomas Lee Hazen, The Law Of Securities Regulation § 12.4 (4th ed.2002) (explaining that Rule 10b–5's "any security" language means that it applies to all types of securities, even those that are exempt from registration). Furthermore, plaintiffs' interpretation of this passage is entirely at odds with the purchaser-seller requirement in *Blue Chip Stamps* that "limits the class of plaintiffs to those who have at least dealt in the security to which the prospectus, representation, or omission relates." *Blue Chip Stamps,* [421 U.S. at 747, 95 S.Ct. 1917].

*Nortel,* 369 F.3d at 32.

In the alternative, Plaintiffs argue that the *Blue Chip Stamps /Nortel* standing re-

---

**8.** The *Nortel* court held that shareholders of JDS Uniphase Corporation ("JDS") lacked standing to assert a Section 10(b) misrepresentation claim against Nortel Networks Corporation ("Nortel") based on Nortel's alleged misstatements made in connection with the sale of a business unit to JDS. The alleged misstatements concerned Nortel's business operations and not those of JDS.

quirement is satisfied here because NYSE's statements related to the market on which the securities at issue were traded. Plaintiffs have cited no authority to support its argument that general statements concerning the integrity of a securities market are tantamount to statements about specific securities traded on that market. Moreover, to recognize standing on this basis might have the undesirable effect of exposing a given securities exchange to litigation by disappointed investors whenever it could be shown that the exchange made a material misstatement or omission about its operations.

Based on the foregoing, it is determined that Plaintiffs' Section 10(b) misstatement/omission claim against NYSE are dismissed with prejudice.

## B. *The State Law Claims Are Dismissed*

■ The Specialist Defendants argue that the state law fiduciary duty claims asserted in Counts Five and Six of the Complaint are preempted under the Securities Litigation Uniform Standards Act of 1998 ("SLUSA"). *See* 15 U.S.C. §§ 77p,

78bb(f). SLUSA provides, in pertinent part, as follows:

> No covered class action[9] based upon the statutory or common law of any State or subdivision thereof may be maintained in any State or Federal court by any private party alleging—
>
> (A) a misrepresentation or omission of a material fact in connection with the purchase or sale of a covered security;[10] or
>
> (B) that the defendant used or employed any manipulative or deceptive device or contrivance in connection with the purchase or sale of a covered security.

15 U.S.C. § 78bb(f)(1). SLUSA also provides that any such action may be removed to federal court. 15 U.S.C. § 78bb(f)(2).

As stated by the Second Circuit:

> Congress enacted SLUSA in 1998 in response to the perceived failure of the PSLRA to achieve its goals. Congressional investigation revealed a "federal flight" loophole whereby many class action plaintiffs avoided the PSLRA's heightened requirements by bringing

---

**9.** SLUSA defines a "covered class action" as:

(i) any single lawsuit in which—

(I) damages are sought on behalf of more than 50 persons or prospective class members, and questions of law or fact common to those persons or members of the prospective class, without reference to issues of individualized reliance on an alleged misstatement or omission, predominate over any questions affecting only individual persons or members; or

(II) one or more named parties seek to recover damages on a representative basis on behalf of themselves and other unnamed parties similarly situated, and questions of law or fact common to those persons or members of the prospective class predominate over any questions affecting only individual persons or members; or

(ii) any group of lawsuits filed in or pending in the same court and involving common questions of law or fact, in which—

(I) damages are sought on behalf of more than 50 persons; and

(II) the lawsuits are joined, consolidated, or otherwise proceed as a single action for any purpose.

15 U.S.C. § 78bb(f)(5)(B).

**10.** SLUSA defines a "covered security" as "a security that satisfies the standards for a covered security specified in paragraph (1) or (2) of section 18(b) of the Securities Act of 1933 [(the 'Securities Act')], at the time during which it is alleged that the misrepresentation, omission, or manipulative or deceptive conduct occurred...." 15 U.S.C. § 78bb(f)(5)(E). Section 18(b) of the Securities Act includes securities that are listed or authorized for listing on certain national securities exchanges. *See* 15 U.S.C. § 77r(b)(1).

suit in state courts under state statutory or common law rather than in federal court. [Citations omitted.] In enacting SLUSA, Congress intended to close this loophole "by making federal court the exclusive venue for class actions alleging fraud in the sale of certain covered securities and by mandating that such class actions be governed exclusively by federal law." [Citation omitted.] *Dabit v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 395 F.3d 25, 32 (2d Cir.2005). Furthermore, the Second Circuit has determined that in enacting SLUSA, Congress evidenced a clear intention " 'to completely preempt the field of certain types of securities class actions by essentially converting a state law claim into a federal claim and creating federal jurisdiction and venue for specified types of state securities fraud claims.' " *Id.* (quoting *Spielman v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 332 F.3d 116, 123 (2d Cir.2003)).

There is no dispute here that this action qualifies as a "covered class action" and that the alleged conduct was "in connection with" the purchase or sale of a "covered security." Nor is there any dispute that breach of fiduciary duty claims are based on state common law. Rather, the parties dispute whether or not Plaintiffs fiduciary duty claims sound in fraud, thereby triggering SLUSA preemption.

The Second Circuit has stated that SLUSA preemption and removal is triggered in lawsuits in which the plaintiff alleges state law violations stemming from a misstatement, omission, or manipulative conduct in connection with the purchase or sale of a covered security. *See Spielman*, 332 F.3d at 124 (2d Cir.2003).

The Specialist Defendants argue that Plaintiffs fiduciary duty claims are based entirely on the same allegations that underpin their Exchange Act claims and therefore, that SLUSA preemption is trig-

gered. Plaintiffs counter that SLUSA preemption is not triggered here because no misstatement or omission was a necessary condition of their fiduciary duty claims.

As stated in the Complaint, the gravamen of the fourth claim is that the unlawful conduct described elsewhere in the Complaint constituted a violation of the fiduciary duties owed by the Specialist Defendants to the Plaintiffs. As stated in the Complaint, the gravamen of the fifth cause of action is that the Brokerage Defendants breached fiduciary duties owed to the Plaintiffs by: (1) causing and/or permitting Plaintiffs' orders to be executed at disadvantageous prices in violation of NYSE rules, and (2) failing to disclose material facts concerning the conduct of the Specialist Defendants.

As pled by the Plaintiffs, the fourth claim stems from alleged manipulative conduct. As pled by the Plaintiffs, the fifth claim stems, at least in part, from alleged material omissions. As such, both claims are preempted by SLUSA. This outcome is not changed by the fact that Plaintiffs have disclaimed any incorporation of fraud allegations into their fiduciary duty claims. *See, e.g., Norman v. Salomon Smith Barney, Inc.*, 350 F.Supp.2d 382, 386 (S.D.N.Y. 2004) (stating that "plaintiffs may not avoid SLUSA pre-emption simply by artful pleading that avoids the actual words 'misrepresentation' or 'fraud[ ]' ").

Plaintiffs have failed to identify an instance in which a court has determined that SLUSA permits the assertion of pendent state law claims based on the same conduct that underpins a plaintiff's Section 10(b) claims. Instead, Plaintiffs rely heavily on a single case from this district in which no Section 10(b) claim was asserted. *See Xpedior Creditor Trust v. Credit Suisse First Boston (USA) Inc.*, 341 F.Supp.2d 258, 268 (S.D.N.Y.2004) (holding

that SLUSA preemption was not triggered where all claims were based on state law and none of the claims were based on fraudulent conduct).

The Plaintiffs argue that this Court should adopt the so-called "necessary component" test articulated by the *Xpedior* court. *See id.* As stated by the *Xpedior* court:

> Regardless of the words used by plaintiffs in their complaints and regardless of the labels they paste on each claim, the question is whether a material misstatement or omission in connection with the purchase or sale of a covered security is a *necessary component* of the claim. To make this determination the simple inquiry is whether plaintiff is pleading fraud in words or substance .... the real question [is] whether the claim [is] based on fraudulent conduct, regardless of the appearance of the words "fraud" or "misrepresentation."

*Id.* (emphasis in original) (canvassing district court cases to determine proper application of *Spielman* court's requirement that courts probe plaintiff's pleadings to determine whether SLUSA preemption applies).

The *Xpedior* court's holding provides a useful articulation of the criteria for determining whether SLUSA preemption has been triggered. Plaintiffs arguments that the fourth and fifth claims are not based on "fraud" and "misrepresentation" notwithstanding, the Complaint's allegations demonstrate that these claims are based on fraudulent conduct. Therefore, fraud was a necessary component of these claims, and they are preempted pursuant to SLUSA.

Based on the foregoing, it is determined that the state law claims asserted in Counts Four and Five of the Complaint are dismissed with prejudice as to all defendants.

## C. *Dismissal of the Claims Against The Specialist Defendants Is Not Warranted Under Section 28(a) Of The Exchange Act*

■ The Specialist Defendants argue that Plaintiffs' claims, to the extent that they are based on the conduct described in the Settlement Orders, are barred by Section 28(a) of the Exchange Act, which provides, in pertinent part, that "no person permitted to maintain a suit for damages under the provisions of this chapter shall recover, through satisfaction of judgment in one or more actions, a total amount in excess of his actual damages on account of the act complained of...." 15 U.S.C. § 78bb(a).[11]

The Specialist Defendants argue that the Settlement Orders precisely calculated the customer disadvantage that resulted from their alleged improper conduct and that the Settlement Orders provide for full restitution (including interest) to customers allegedly affected by that conduct. The Plaintiffs argue that the alleged fraudulent and manipulative scheme at issue in this action exceeds the conduct uncovered in the SEC's investigation. Furthermore, the Plaintiffs argue that the Specialist Defendants' double recovery argument is premature in that until there is a pool of evidence relating to violations and damages for the current action, no determination can be made as to the extent of the overlap with the SEC settlements.

11. The Second Circuit has stated that Section 28(a) has two general purposes. *See Osofsky v. Zipf,* 645 F.2d 107, 111 (2d Cir.1981). First, it is intended "to prevent double recovery by those who assert both state and federal claims arising out of the same conduct." *Id.* Second, it prohibits the recovery of punitive damages in private actions based on alleged violations of the Exchange Act. *Id.*

The Specialist Defendants rely heavily on two decisions from outside this circuit to support the argument that dismissal is warranted at this early phase of the litigation pursuant to Section 28(a). *See Friedman v. Bache Halsey Stuart Shields, Inc.*, No. 80 C 1111, 1985 U.S. Dist. LEXIS 21106 (D.Ill. Apr. 2, 1985) (dismissing claims by plaintiff who had previously recovered the full amount of actual damages, as fixed based on plaintiff's previous responses to interrogatories); *In re Nat'l Mortg. Equity Corp. Mortg. Pool Certificates Sec. Litig.*, 636 F.Supp. 1138 (D.Cal. 1986) (holding that the single-recovery rule and the rules of contribution and indemnity barred a tortfeasor from asserting direct claims that had been assigned to it by an injured party that received full compensation for its injuries in exchange).[12]

As suggested by their idiosyncratic fact patterns, *Friedman* and *National Mortgage* are both distinguishable from the present case. In *Friedman*, it was undisputed that plaintiff's losses from defendants' fraud did not exceed the $508,338 that plaintiff had previously received in settlement funds, thereby permitting the court to determine as a matter of law that his claim was barred by the single-recovery rule. *Friedman*, 1985 U.S. Dist. LEXIS 21106, at *2–3. The *National Mortgage* decision was animated in large measure by the Court's concern that the

assignment of the injured parties' claim to the plaintiff was effected for the purpose of permitting the plaintiff to circumvent the rules applicable to actions for contribution and/or indemnity. *See Nat'l Mortg.*, 636 F.Supp. at 1150–51. Moreover, there was no dispute in *National Mortgage* as to whether the amount that the plaintiff paid to the injured parties was equivalent to the full value of the losses they suffered as a result of the fraudulent scheme.

In contrast, there is a dispute here as to whether the sums paid by the Specialist Defendants pursuant to Settlement Orders are equivalent to the full value of the losses suffered by the Plaintiffs. Moreover, the structure of the SEC-administered distribution funds evidence a substantial degree of uncertainty concerning the SEC's calculations concerning the magnitude of the losses suffered by customers as a result of the Specialist Defendants' conduct. Pursuant to the Settlement Orders, each specialist firm was required to disgorge funds equivalent to the SEC's calculation of the customer disadvantage caused by that firm's conduct. However, the distribution fund for each specialist firm (*i.e.*, the fund established to facilitate reimbursement of customers for their losses) includes not only disgorgement but also the civil penalties imposed on the specialist firm. The following table provides a summary of the

12. *National Mortgage* involved an alleged fraudulent scheme in connection with the sale of mortgage pool certificates to savings and loan associations (the "Investor Institutions"). *Id.* at 1145–47. Pursuant to this scheme, defendants engaged in sham mortgage transactions between related entities that diverted the Investor Institutions' funds for defendants' personal benefit. *Id.* One of the plaintiffs, Bank of America ("BoA"), asserted claims brought in its own right and as assignee of nineteen Investor Institutions. *Id.* BoA was trustee to certain of these mortgage

pools. *Id.* In this capacity, BoA was responsible for reviewing mortgages to determine whether they qualified for inclusion in a given pool. *Id.* In a subsequent internal investigation, BoA determined that certain of its employees had not adequately discharged their duties in connection with BoA's role as trustee. *Id.* According to BoA, it resolved its potential liability to the Investor Institutions by repurchasing its certificates or by replacing the mortgages in the affected mortgage pools. *Id.* In return, the Investor Institutions assigned to BoA any claims they might have against the defendants. *Id.*

value of each specialist firm's distribution fund in comparison to the value of the customer disadvantage allegedly caused by that firm's conduct.

| Specialist Firm | SEC's Calculation Of Total Customer Disadvantage Caused | Total Size Of Distribution Fund Established | Percentage Difference |
|---|---|---|---|
| LaBranche LLC | $41,646,440 | $63,518,760 | 52% |
| Spear Leeds LLC | $28,776,072 | $45,272,478 | 57% |
| VDM Specialists | $34,926,613 | $57,675,104 | 65% |
| Fleet Specialist | $38,013,594 | $59,097,469 | 55% |
| Bear Wagner LLC | $10,724,903 | $16,259,446 | 52% |
| SIG Specialists | $2,045,571 | $988,018 | 48% |
| Performance Specialist | $1,491,171 | $680,761 | 46% |

The fact that the overall size of each of the distribution funds exceeds the calculated customer disadvantage may suggest that the SEC and the Specialist Defendants anticipated that actual disadvantage suffered by customers was likely to exceed the SEC's calculations as to the total value of such disadvantage. In short, the facts alleged support the inference that the customer disadvantage calculations contained in the Settlement Orders were no more than estimates of the total amount of customer disadvantage caused by Specialist Defendants, and do not constitute caps on the amount of damages that could be recovered by the Plaintiffs.

Under these circumstances, and in the absence of any controlling authority requiring this Court to adopt the SEC's calculations concerning the value of the losses suffered by the Plaintiffs, Section 28(a) does not compel dismissal at this state of the litigation. See, e.g., Hayes v. Gross, 982 F.2d 104, 109 (3d Cir.1992) (stating that dismissal of an otherwise well-pleaded claim is not warranted where "double recovery is not inherent in plaintiff's theory of the case and, accordingly, that recovery without duplication is possible"). Rather, in the event that Plaintiffs' claims are otherwise viable, the proper course is for discovery to go forward and for the Specialist Defendants to interpose the double-recovery defense at an appropriate phase of this litigation. See id. (stating that a double-recovery defense should be evaluated "in the specific fact context presented by plaintiff's case on damages").

In opposition to the Specialist Defendants argument with respect to the single-recovery rule, Plaintiffs have argued that the following text, which appears in identical form in each of the Settlement Orders, denies the Specialist Defendants any offset of damages in related investor actions:

To preserve the deterrent effect of the civil penalty, Respondent agrees that it shall not, in any Related Investor Action, benefit from any offset or reduction of any investor's claim by the amount of any Fair Fund distribution to such investor in this proceeding that is proportionately attributable to the civil penalty paid by Respondent ("Penalty Offset"). If the court in any Related Investor Action grants such an offset or reduction, Respondent agrees that it shall, within 30 days after entry of a final order granting the offset or reduction, notify the Commission's counsel in this action and pay the amount of the Penalty Offset to the United States Treasury

or to a Fair Fund, as the Commission directs. Such a payment shall not be deemed an additional civil penalty and shall not be deemed to change the amount of the civil penalty imposed against Respondent in this proceeding. (Bear Wagner Specialists LLC, Order Instituting Administrative and Cease-and-desist Proceedings ..., No. 49498, 2004 WL 626586, at *11 (Mar. 30, 2004)).

Plaintiffs' interpretation of this passage flies in the face of the well-settled rule that a plaintiff is entitled to only one satisfaction for each injury. *See, e.g., Singer v. Olympia Brewing Co.,* 878 F.2d 596, 600 (2d Cir.1989) (quoting Restatement (Second) of Torts § 885(3) (1979)). As suggested by the Specialist Defendants, the more natural reading of the passage is that it prevents the use of civil penalty payments to offset civil damages. The following hypothetical is illustrative.

Assume that a given specialist firm was required to pay $50 in civil penalties and $50 in disgorgement. Pursuant to the standard terms of the settlement order, all $100 of these funds would be added to a distribution fund to be distributed to customers disadvantaged by that specialist's conduct. Assume that $51 of the fund (*i.e.,* $50 of disgorgement funds and $1 of civil penalty funds) is distributed to customers by the distribution fund's administrator. Assume further that in a subsequent civil action, it is determined that these same customers suffered $52 of losses as a result of the specialist firm's conduct. Finally, assume that the court ordered the customers' $52 recovery offset by the $51 previously received from the fund. Pursuant to the above-described provision of the Settlement Orders, the specialist firm would be required to pay the amount of the penalty offset (*i.e.,* $1) to the United States Treasury or to the distribution fund. In this way, the specialist firm is prevented from dipping into the civil penalties paid to the SEC in order to offset its civil liability. But as demonstrated by the foregoing hypothetical, no plaintiff is permitted to recover more than the total value of the loss suffered by that defendant.

Finally, it should be noted that the above-described provision provides further support for the determination that this action is not barred by the single-recovery rule. That is, the provision supports the inference that both the SEC and the Specialist Defendants anticipated that private investor actions would proceed in tandem with the distribution of the SEC settlement funds and that damage awards in such actions might exceed the total value of customer disadvantage, as calculated by the SEC.

Based on the foregoing, it is determined that the single-recovery rule embodied in Section 28(a) of the Exchange Act does not warrant dismissal of this action at this stage of the litigation.

## D. *Plaintiffs Have Stated A Section 10(b) Manipulative Scheme Claim Against The Specialist Firms, LaBranche LLC and VDM Holding*

Count One of the Complaint alleges, in part, that the defendants violated Section 10(b) of the Exchange Act by engaging in a manipulative scheme that caused the plaintiffs and other NYSE customers to purchase or sell shares at distorted and manipulated prices. A court of this district has recently provided the following guidance with respect to the pleading requirements for fraudulent scheme claims.

▉▉▉ First, in order to satisfy Rule 9(b) and the PSLRA, a manipulative scheme claim must specify must specify "[1] what manipulative acts were performed, [2] which defendants performed them, [3] when the manipulative acts were

performed, and what effect the scheme had on the market for the securities at issue." *S.E.C. v. U.S. Environmental, Inc.* 82 F.Supp.2d 237, 240 (S.D.N.Y.2000). Second, scienter must be alleged. *Id.* Third, a plaintiff need not "plead every manipulative stock trade individually[.]" *Id.* Rather, it is adequate to couple detailed descriptions of a few sample trades with more general allegations. *Id.* Third, plaintiff must satisfy Rule 9(b) as to each individual defendant and "cannot do so by making vague allegations about the defendants as a unit[.]" *Id.* at 241.

### 1. Plaintiffs' Allegations Concerning Pennying, Freezing The Book, and 1998 Conduct

The Specialist Defendants argue that certain of the Complaint's allegations, which are said to be beyond the scope of the conduct alleged in the Settlement Orders, have not been pled with requisite particularity pursuant to Rule 9(b) and/or fail to state a claim upon which relief can be granted. The Specialist Defendants have identified three such categories of add-on allegations: (1) pennying (*see* Compl. ¶¶ 78–79); (2) freezing the book (*see id.* ¶¶ 90–104); and (3) interpositioning and trading ahead for some 2.5 months at the end of 1998 (*see id.* ¶ 136).

First, it is determined that the term "pennying" is used in the Complaint mere-ly as a synonym for interpositioning. Indeed, the Complaint contains no allegations relating specifically and solely to pennying. To the extent that the Plaintiffs intended to allege a manipulative practice known as pennying that is distinct from interpositioning, such allegations must be dismissed pursuant to Rule 9(b) for lack of particularity.

Second, it is determined that as used in the Complaint, the term "freezing the book," describes a tactic used by the Specialist Firms to facilitate interpositioning and trading ahead. During discovery, Plaintiffs are entitled to inquire into whether and to what extent the Specialist Firms employed the technique of freezing the Display Book. However, Plaintiffs' have failed to identify any specific instances in which any of the Specialist Firms engaged in freezing the Display Book. Therefore, to the extent that the Plaintiffs have alleged a manipulative practice known as "freezing the book" that is distinct from interpositioning or trading ahead, such allegations must be dismissed pursuant to Rule 9(b) for lack of particularity.

Third, the Specialist Defendants argue that Plaintiffs' claims based on alleged trading from October 17 to December 31 of 1998 are barred by the applicable statute of limitations.[13] Plaintiffs have not

---

**13.** Pursuant to Section 804 of the Public Company Accounting Reform and Investor Protection Act of 2002 (the "Sarbanes–Oxley Act"), Pub.L. No. 107–204, 116 Stat. 745 (2002), a complaint filed on or after July 30, 2002 asserting a private securities fraud claim "may be brought no later than the earlier of (1) 2 years after the discovery of the facts constituting the violation; or (2) 5 years after such violation." 28 U.S.C. § 1658(b). The limitations period in Sarbanes–Oxley applies both to claims brought pursuant to sections 10(b) and 20(a) of the Exchange Act. *See, e.g., Marcus v. Frome,* 329 F.Supp.2d 464, 475 (S.D.N.Y.2004); *see also Dodds v. Cigna Sec., Inc.,* 12 F.3d 346, 350 n. 2 (2d Cir.1993) (stating that a Section 20 claim based on a Section 10(b) violation is governed by the Section 10(b) statute of limitations).

The Second Circuit has held that Section 804 of the Sarbanes–Oxley Act does not function retroactively, and, therefore, it cannot revive claims that were stale as of July 30, 2002, the date of Sarbanes–Oxley's enactment. *See Enterprise Mortg, Acceptance Co., LLC, Sec. Litig. v. Enterprise Mortg. Acceptance Co.,* 391 F.3d 401, 406 (2d Cir.2004). Prior to the enactment of Sarbanes–Oxley,

seriously opposed the Specialist Defendants' motion with respect to the 1998 claims. Therefore, the Complaint is dismissed with prejudice with respect to conduct that is alleged to have occurred between October 17 and December 31 of 1998.

## 2. With Respect To Interpositioning and Trading Ahead, Scienter Has Been Adequately Pled As To The Specialist Firms, LaBranche & Co., M. LaBranche, and VDM Holdings

■ In their separate motions to dismiss, the Specialist Defendants and the SIG defendants do not seriously challenge whether the Plaintiffs have stated a Section 10(b) manipulative scheme claim with respect to at least some of the conduct alleged in the Settlement Orders and further alleged in the April, 2005 indictments.[14] Rather, they argue that Plaintiffs have failed to adequately plead scienter beyond those trades involving the individual stocks specified in the Settlement Orders.

■ The Second Circuit has stated that in order to plead scienter, " 'the requisite intent of the alleged [perpetrator of the fraud] need not be alleged with great specificity.' " *Wight v. BankAmerica Corp.*, 219 F.3d 79, 91 (2d Cir.2000) (quoting *Chill v. General Elec. Co.*, 101 F.3d 263, 267 (2d Cir.1996) (citing *Cohen*, 25 F.3d at 1173)). Rather, plaintiffs need only plead " 'circumstances that provide at least a minimal factual basis for their conclusory allegations of scienter.' " *Cohen v. Koenig*, 25 F.3d 1168, 1173 (2d Cir.1994) (quoting *Connecticut Nat'l Bank v. Fluor Corp.*, 808 F.2d 957, 962 (2d Cir.1987)). Courts of this district have observed that while scienter cannot be adequately alleged based on generalized allegations concerning the existence of a scheme, it is sufficient for the purposes of pleading scienter for a complaint to couple broader allegations with detailed descriptions of sample trades. *See, e.g., Endovasc Ltd., Inc. v. J.P. Turner & Co., LLC*, No. 02 Civ. 7313(LAP), 2004 WL 634171, at *13 (S.D.N.Y. Mar.30, 2004) (citing *S.E.C. v. U.S. Envtl., Inc.*, 82 F.Supp.2d 237, 240 (S.D.N.Y.2000))

■ The Complaint and Settlement Orders, which couple (1) detailed descriptions of sample trades where specialists engaged in interpositioning or trading ahead with (2) generalized allegations concerning the Specialist Firms' knowledge of illegal trading by their employees, are more than sufficient to support a strong inference that the Specialist Firms en-

[t]he statute of limitations for claims pursuant to section 10(b) of the Securities Exchange Act and SEC Rule 10b–5 [was] "within one year after the discovery of the facts constituting the violation and within three years after such violation." 15 U.S.C. § 78i(e) (2000). "Discovery of facts for the purposes of this statute of limitations includes constructive or inquiry notice, as well as actual notice." *Rothman v. Gregor*, 220 F.3d 81, 96 (2d Cir.2000) (internal quotation marks omitted); *see also Dodds v. Cigna Sec., Inc.*, 12 F.3d 346, 350 (2d Cir. 1993). "A plaintiff in a federal securities case will be deemed to have discovered fraud for purposes of triggering the statute of limitations when a reasonable investor of ordinary intelligence would have discovered the existence of the fraud." *Dodds*, 12 F.3d at 350.
*Newman*, 335 F.3d at 193.

**14.** That is, it has been alleged that between January 1999 through 2003, the Specialist Defendants breached their duty to refrain from dealing for their own accounts while in possession of executable buy and sell customer orders. It is alleged that the Specialist Defendants effected improper proprietary trades at the expense of customer orders. Such improper trading allegedly took three forms: interpositioning, trading ahead, and failing to execute limit orders.

gaged in interpositioning and trading ahead with scienter throughout the Class Period. *See S.E.C. v. U.S. Envtl., Inc.,* 155 F.3d 107, 111 (2d Cir.1998) (stating that "knowledge of the proscribed activity is sufficient scienter under § 10(b)") (citing *S.E.C. v. First Jersey Sec., Inc.,* 101 F.3d 1450, 1467 (2d Cir.1996); *S.E.C. v. Lorin,* 76 F.3d 458, 460 (2d Cir.1996)). The inference that LaBranche LLC, Spear Leeds LLC, VDM Specialists, Fleet Specialist, and Bear Wagner LLC acted with scienter is further strengthened by the particularized allegations of conscious misbehavior contained in the April, 2005 indictments. Finally, it should be noted that under established principles of agency theory, the specialist firms can be held liable for their agents' Section 10(b) violations if such violations were committed within the scope of the agency relationship. *See, e.g., Vento & Company of New York, LLC v. Metromedia Fiber Network, Inc.,* No. 97 Civ. 7751(JGK), 1999 WL 147732, at *12–13 (S.D.N.Y. Mar.18, 1999) (holding that a plaintiff may rely on agency principles to state a Section 10(b)).

■■■■ Defendants have also argued that the Plaintiffs have failed to plead that the Affiliated Companies acted with scienter in connection with the alleged manipulative scheme. Plaintiffs argue that they have satisfied this burden merely by stating that the Affiliated Companies "had actual knowledge of the illegal practices and omissions[.]" (Compl.¶ 237.) Courts of this Circuit have recognized a variety of ways in which to allege that a parent company (or related entity) acted with scienter in connection with a manipulative scheme effectuated by a corporate subsidiary. For example, facts can be alleged that show that the subsidiary's scheme was orchestrated by the parent company. *See, e.g., Carlson v. Xerox Corp.,* 392 F.Supp.2d 267, 287–88 (D.Conn.2005). In addition,

the burden can be carried by alleging that the parent company was a party to, or otherwise involved in, the allegedly manipulative transactions. *See, e.g., In re Parmalat Sec. Litig.,* 376 F.Supp.2d 472, 507 (S.D.N.Y.2005). Furthermore, scienter can be pled by properly alleging that the parent recklessly disregarded red flags that should have put it on notice of the subsidiary's manipulative scheme. *See, e.g., In re General Elec. Sec. Litig.,* No. 94 Civ. 4024(JFK), 1995 WL 590639, at *3 (S.D.N.Y. Oct.4, 1995). No such allegations of these sort have been made with respect to Spear Leeds LP, Goldman Sachs & Co., the Goldman Sachs Group, FleetBoston Corp., Bank of America, Quick & Reilly, Bear Stearns & Co., SIG LLP, or Susquehanna. Rather, the statements contained in paragraph 237 of the complaint are conclusory. Therefore, Count One of the Complaint is dismissed as to these defendants.

■■■■ However, as discussed in today's companion opinions, it has been properly alleged in related cases that LaBranche & Co., M. LaBranche, and VDM Holding each ignored red flags concerning the improper trading practices of their respective subsidiaries. Since the improper trading practices alleged in the LaBranche and VDM shareholder actions are identical to the alleged improper trading by LaBranche LLC and VDM Specialists at issue here, for the purpose of this motion, the Court may take judicial notice of the allegations contained in those complaints. *See, e.g., In re Pruitt,* 72 B.R. 436, 440 n. 4 (Bankr.E.D.N.Y.1987) (stating that a court may take judicial notice of the content of its files). On the basis of the allegations asserted in the VDM shareholders' action, it is determined that scienter has been alleged as to VDM Holding from October 18, 2001 until October 15, 2003. Likewise, based on the allegations contained in the

LaBranche & Co. shareholders action, it is determined that scienter has been alleged as to M. LaBranche and LaBranche & Co. from August 19, 1999 until October 15, 2003.

### 3. *Plaintiffs Have Adequately Alleged Loss Causation*

In their separate motions, the Specialist Defendants and the SIG Defendants argue that the Plaintiffs have failed to plead loss causation with adequate particularity. "Loss causation simply 'is the causal link between the alleged misconduct and the economic harm ultimately suffered by the plaintiff.'" *In re Mutual Funds Inv. Litig.*, 384 F.Supp.2d 845 (D.Md.2005) (quoting *Emergent Capital Inv. Mgmt., LLC v. Stonepath Group, Inc.*, 343 F.3d 189, 197 (2d Cir.2003)). In order to adequately allege loss causation, plaintiffs must allege that the defendants' "misrepresentation[s] (or other fraudulent conduct) proximately caused the plaintiff[s'] economic loss." *Dura Pharmaceuticals, Inc. v. Broudo*, —— U.S. ——, ——, 125 S.Ct. 1627, 1633, 161 L.Ed.2d 577 (2005).

Rule 8(a)(2), Fed.R.Civ.P., controls the specifics of the required pleading of loss causation, as there is no "special further requirement in respect to the pleading of proximate causation or economic loss." *Id.* at 1634. "So long as Plaintiffs allege a coherent scheme to defraud the accounts directly for their losses, loss causation has been adequately pled." *In re Initial Pub. Offering Sec. Litig.*, 241 F.Supp.2d 281, 375 (S.D.N.Y.2003).

The Specialist Defendants and the SIG Defendants argue that the Plaintiffs have failed to identify any particular trades in which they suffered loss as a result of the Specialist Firms' alleged manipulative conduct. As stated previously, Plaintiffs are not required to separately allege the elements of their Section 10(b) manipulative scheme claim for each individual transaction. Rather, it is sufficient for a plaintiff to couple specific allegations concerning sample transactions with more general allegations concerning the conduct of the defendant. Here, Plaintiffs have annexed to the Complaint records of stock trades that indicate that during the Class Period, Plaintiffs made scores of trades in 41 of the 42 stocks identified in the Settlement Orders. Given the limitation on the facts that could be expected to be within Plaintiffs' purview, the annexation of these records to the Complaint is sufficient to allege that Plaintiffs participated in transactions in which they paid disadvantageous prices as a result of the Specialist Firms' manipulative conduct. *See, e.g., In re Blech Sec. Litig.*, 928 F.Supp. 1279, 1292 (S.D.N.Y.1996).

Defendants also argue that the Supreme Court's recent decision in *Dura* that plaintiff's allegation that he paid "an artificially inflated purchase price" inadequate to plead loss causation warrants dismissal. *Dura*, 125 S.Ct. at 1631. While Dura may have relied on the premise that in the typical case "the inflated purchase payment is offset by ownership of a share that *at that instant* possesses equivalent value," the facts present here do not constitute the typical case. *Id.* (emphasis in original). Here, the ownership of a share does not possess an "equivalent value," *id.*, but rather a value which plaintiffs allege was manipulated by the specialist. (*See* Compl. ¶¶ 78–80). Plaintiffs allege that it was the specialists' manipulative conduct at the time of the transaction[15] that

---

**15.** Plaintiffs allege that Defendants, rather than matching orders as they should have, purchased shares from sellers at a manipulated lower price, only to turn around an sell shares to a purchaser at a manipulated higher price, locking in a guaranteed riskless profit.

316

caused their losses. As such, the "equivalent value," *id.*, of the shares for the purchaser and the seller would have been the price had the specialist performed his function properly. Therefore, the Supreme Court's decision in *Dura* is inapposite, and Plaintiffs have adequately pled loss causation under the unique facts of this case.

**4. Performance and The SIG Defendants Have Failed To Establish That They Are Insulated As A Matter of Law From Liability For Prior Trades Engaged In By Specialist Firms/Units That They Acquired During The Class Period**

**a. The SIG Defendants**

The SIG Defendants argue that some portion of the improper conduct that they are alleged to have engaged in during the Class Period was actually committed by two specialist firms acquired by SIG Specialists during the Class Period: Corroon Lichenstein & Co., LLC ("Corroon") and Weiskopf Silver Specialists LLC ("Weiskopf"). Furthermore, the SIG Defendants allege that some portion of the conduct identified in the Settlement Orders was committed prior to the dates that these two firms were acquired. Corroon was apparently acquired in March 2000 and Weiskopf was apparently acquired in July 2001.

The SIG Defendants appear to argue that as a matter of general federal common law, the purchaser of a corporation's assets does not, as a result of the purchase, ordinarily become liable for the seller's debts. On this basis, the SIG Defendants argue that this Court must dismiss the Section 10(b) claim against them to the extent that it is based on conduct engaged in by Corroon and Weiskopf prior to their acquisition by SIG Specialists.

This argument fails for two reasons. First, successor liability is typically governed not by general federal common law, but rather by the law of the state whose law applies to the interpretation and enforcement of a merger agreement. *See, e.g., Cargo Partner AG v. Albatrans, Inc.,* 352 F.3d 41, 45 (2d Cir.2003) (applying New York rule concerning successor liability); *Nettis v. Levitt,* 241 F.3d 186, 193 (2d Cir.2001) (observing that no conflict existed between New York and New Jersey law with respect to the imposition of successor liability). Here, the SIG Defendants have failed to indicate what state's law governed the enforcement of the terms of SIG Specialists' acquisition of Corroon and Weiskopf. Under such circumstances, it is impossible to determine as a matter of law that the SIG Defendants cannot be held liable for conduct by Corroon and Weiskopf that predated their acquisition by SIG Defendants.

Furthermore, the above-described general rule concerning successor liability is subject to well-recognized exceptions. For example, pursuant to the law of New York and New Jersey, "when a successor firm acquires substantially all of the predecessor's assets and carries on substantially all of the predecessor's operations, the successor may be held to have assumed its predecessor's tort liabilities, notwithstanding the traditional rule that a purchaser of corporate assets does not assume the seller's liabilities." *Nettis,* 241 F.3d at 193. Other well-recognized exceptions to the above-described general rule of a non-liability include: (1) "where the purchaser either expressly or implicitly has agreed to assume some or all of the debts and liabilities of the seller"; (2) "where there is a continuity of ownership or corporate structure between the selling corporation and the buying corporation"; and (3) "where a transaction is entered into fraudulently in

order to evade liability for debts." David W. Pollak, *Successor Liability in Asset Acquisitions, in* 2 PLI Course Handbook, Acquiring or Selling the Privately Held Company 2002, at 271–75 (2003) (collecting cases).

As suggested by the above-described exceptions, the analysis of whether a defendant can be held liable for a predecessor's obligations, whether such obligations arise in tort or contract, is fact-intensive. Therefore, at this stage of the litigation, it is appropriate to deny the SIG Defendants' motion with respect to conduct alleged to have been committed by Corroon and Weiskopf prior to their acquisition by SIG Specialists. Finally, it should be noted that while the SIG Defendants argue that some of the illegal activity alleged in the Complaint may have occurred before SIG Specialists acquired Corroon and Weiskopf, they do not dispute that other of the conduct was committed by SIG Specialists during the Class Period.

### b. *Performance*

Similar to the SIG Defendants, Performance has argued that it was formed as a result of its acquisition in October 1999 of the assets of two specialist units. Performance argues that it is the smallest NYSE specialists firm and that the volume of trading affected by its allegedly improper conduct was extremely small. Moreover, Performance argues that it is not liable for alleged violations committed by other specialists before it acquired their assets. As discussed above, there are significant issues of fact that preclude this Court from determining, as a matter of law, that Performance is insulated from liability with respect to the pre-acquisition conduct of its business units. That is, this issue cannot be properly resolved without the development of a record concerning: (1) which state's law should apply to the

question of Performance's successor liability, and (2) whether under that state's law, the particular facts and circumstances of Performance's acquisitions would render it liable for their pre-acquisition conduct.

### E. *Plaintiffs Adequately State A Section 10(b) Claim Based on Defendants' Allegedly False And Misleading Statements*

■ Plaintiffs have alleged that certain of the Specialist Firms, as well as LaBranche & Co., M. LaBranche, and SIG LLP made false and misleading statements in violation of Section 10(b). As stated previously, the elements of a Section 10(b) misrepresentation claim are that the defendant "(1) made misstatements or omissions of material fact; (2) with scienter; (3) in connection with the purchase or sale of securities; (4) upon which plaintiff[ ] relied; and (5) that plaintiff['s] reliance was the proximate cause of [the] injury." *In re Livent, Inc. Sec. Litig.,* 78 F.Supp.2d at 213. Defendants argue that dismissal of Plaintiffs' misrepresentation claim is warranted because: (1) the statements at issue merely reiterate the duty that Defendants are alleged to have breached through the operation of the manipulative scheme described in the Complaint, and (2) the Plaintiffs have failed to adequately plead reliance on the statements at issue. Plaintiffs argue that the statements at issue do more than merely reiterate a specialists' obligations and that they are entitled to a presumption of reliance based on the fraud-on-the-market theory.

■ With respect to Defendants' first contention, as the Federal Rules of Civil Procedure permit the pleading of claims in the alternative, *see* Fed.R.Civ.P. 8(e)(2), Plaintiffs are not precluded from pleading a manipulative scheme claim and a misrepresentation claim based upon the same

underlying conduct. Therefore, assuming arguendo Plaintiffs manipulative scheme claim and misrepresentation claim are based upon a breach of the same underlying duty, dismissal on such grounds would be improper at this stage. To the extent that discovery reveals that the two claims overlap and the law prohibits this, Defendants may move for dismissal at the appropriate stage of this litigation.

 With respect to Defendants' second argument, the general rule with respect to securities fraud claims is that in order to plead reliance, the plaintiff must specifically allege direct reliance upon the defendant's misrepresentation or omission. *See, e.g., Clark v. Nevis Capital Management, LLC,* No. 04 Civ. 2702(RWS), 2005 WL 488641, at \*18 (S.D.N.Y. Mar.2, 2005). However, under proper circumstances, a plaintiff may rely on the fraud-on-the-market doctrine in order to plead reliance. As stated by the Second Circuit:

> The fraud-on-the-market doctrine, as described by the Supreme Court in *Basic v. Levinson,* creates a rebuttable presumption that (1) misrepresentations by an issuer affect the price of securities traded in the open market, and (2) investors rely on the market price of securities as an accurate measure of their intrinsic value. *See Basic,* 485 U.S. 224, 245–47, 108 S.Ct. 978, 99 L.Ed.2d 194 (1988); *accord, e.g., In re Ames Dep't Stores Inc. Stock Litig.,* 991 F.2d 953, 967 (2d Cir.1993). This presumption, if unrebutted, thus allows plaintiffs to satisfy the element of reliance in securities fraud claims under the 1934 Act.... [T]he doctrine "arose as a practical response to the difficulties of proving direct reliance in the context of modern securities markets, where impersonal trading rather than a face-to-face transaction is the norm." [*In re WorldCom, Inc. Sec. Litig.,* 219 F.R.D. 267, 291

(S.D.N.Y.2003).] Although the fraud-on-the-market doctrine clearly applies to statements made by *issuers,* as in *Basic,* we have never addressed whether it also applies to reports by *analysts.*

*Hevesi v. Citigroup Inc.,* 366 F.3d 70, 77 (2d Cir.2004). As stated by a leading commentator, the rationale underlying the fraud-on-the-market doctrine is that:

> [t]he integrity of the securities markets is premised on the dissemination of accurate information about companies and their securities. When misleading information is injected into the market, it can move securities prices in an artificial manner.... When the pricing mechanisms are rendered inaccurate because of material misinformation, something that is tantamount to a fraud has taken place.

Thomas Lee Hazen, Law of Securities Regulation § 12.10[6][A] (Fraud on the Market Defined) (5th ed.2005).

Here, Plaintiffs allege that the Specialist Defendants made misrepresentations and misstatements concerning not specific securities, but rather the marketplace for those securities. The Complaint alleges, in essence, that the Specialist Defendants made false and misleading statements concerning (1) the extent of their efforts to minimize the transaction costs paid by their customers in connection with the purchase or sale of an otherwise efficiently priced security, and (2) the extent to which stocks were bought and sold at market prices, as opposed to artificially high and low prices.

 The fraud-on-the-market doctrine is applicable to misstatements about specific securities as well as misstatements about the marketplace for those securities. *See In re Blech,* 961 F.Supp. 569, 587 (S.D.N.Y.1997). As in *Blech,* Plaintiffs allege that the Specialist Defendants' false

and misleading statements were "in the context of market manipulation." *Id.* at 587. The reliance upon which Plaintiffs' claims rest was the honesty and integrity of the NYSE.

As noted, the fraud-on-the-market doctrine is premised on the understanding that the dissemination of misleading information about a given security will move the price of that security in an artificial manner. Just as information about a specific security is reflected in the price of that security, so too is information about the manner in which transactions would be completed reflected in the price of securities generally. Plaintiffs may be presumed to have relied upon information indicating that securities would be matched by specialists, as opposed to bought and sold at artificially high and low prices.[16]

Accordingly, Plaintiff's allegations fall within the fraud-on-the-market doctrine and reliance upon the alleged misrepresentations is presumed.

### E. *Plaintiffs Have Stated A Section 20(a) Claim Against All Specialist Defendants Except Susquehanna*

 Count Two of the Complaint alleges that the Defendants are liable for controlling persons culpable of violating section 10(b) in violation Section 20(a) of the Exchange Act. Section 20(a) provides as follows:

> Every person who, directly or indirectly, controls any person liable under any provision of this chapter or of any rule or regulation thereunder shall also be liable ... to the same extent as such controlled person ... unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action.

15 U.S.C. § 78t(a).

In order to plead control person liability under Section 20(a), a plaintiff must "allege a primary § 10(b) violation by a person controlled by the defendant and culpable participation by the defendant in the perpetration of the fraud". *Suez Equity Investors, L.P. v. Toronto–Dominion Bank,* 250 F.3d 87, 101 (2d Cir.2001) (holding that plaintiffs had stated a Section 20(a) claim against defendant bank where it was alleged that: (1) the person who had committed the alleged violation of Section 10(b) was an officer of the bank, and (2) the officer was responsible for the bank's relationship with a venture whose securities were the subject of the alleged Section 10(b) violation).

Here, it is alleged that the each of the Defendants acted as a controlling person within the meaning of Section 20(a). The Specialist Defendants [17] argue that no control person liability can arise here because no claim for a primary violation of Section 10(b) has been stated. Since it has been determined that the Plaintiffs have stated a Section 10(b) manipulative scheme claim against the Specialist Firms, LaBranche & Co., M. LaBranche and VDM Holding, this argument fails. Moreover, The Specialist Defendants have asserted no other basis for dismissal of Plaintiffs' Section 20(a) claim.

---

**16.** For example, to the extent that a given specialist defendant was the specialist of a given stock, the information they disseminated was incorporated into the total mix of information about that given stock upon which investors are presumed to have relied under the fraud-on-the-market exception.

**17.** As set forth above, under the facts alleged by the Plaintiffs, NYSE has absolute immunity from control person liability.

Courts of this district have indicated that a person is either a "control person" or a "primary violator" under section 20(a), but cannot be both. *See Kalnit v. Eichler,* 85 F.Supp.2d 232 (S.D.N.Y.1999), *aff'd* 264 F.3d 131 (2d Cir.2001). In *Kalnit,* the plaintiff sought to hold the individual directors of a corporate defendant liable as control persons for misrepresentations and omissions that they themselves were alleged to have made. *See id.* at 245. In order to establish liability under Section 20(a) as to the individual defendants in that case, the plaintiff necessarily would have had to establish those very defendants' liability as primary violators. *See id.* The court concluded, therefore, that, "under plaintiff's own theory, the Directors could not be control persons and section 20(a) does not apply." *Id.*

The logical inconsistency that required dismissal of the Section 20(a) claim in *Kalnit* is not present here, where multiple manipulative schemes are alleged to have been effectuated by various of the Specialist Defendants. It is conceivable that one defendant ultimately might be found to be a primary violator while another defendant might be found to be a control person under Section 20(a). As the Federal Rules of Civil Procedure permit the pleading of claims in the alternative, *see* Fed.R.Civ.P. 8(e)(2), Plaintiffs are not precluded from pleading that the Defendants are both primary violators and control persons.

Based on the foregoing, it is determined that Plaintiffs have stated a Section 20(a) claim against the Specialist Defendants.

■■■ Finally, the SIG Defendants argue that Plaintiffs have failed to plead with requisite particularity that SIG LLP and Susquehanna exercised control over SIG Specialists and that these two entities had culpable participation in the alleged Section 10(b) violations. This court has previously indicated that the culpable participation element of the Section 20(a) claim is subject to the PSLRA's heightened pleading requirements. *See In re Regeneron Pharmaceuticals, Inc. Sec. Litig.,* No. 03 Civ. 3111, 2005 WL 225288, at *11, n. 4 (S.D.N.Y. Feb. 1, 2005). However, the Court is now of the view that in order to state a Section 20(a) claim, no such particularized allegations are required. *See In re WorldCom, Inc. Sec. Litig.,* 294 F.Supp.2d 392, 415 (S.D.N.Y. 2003) (stating that "[t]he concept of culpable participation describes that degree of control which is sufficient to render a person liable under Section 20(a). At the pleading stage, the extent to which the control must be alleged will be governed by Rule 8's pleading standard.") Here, Plaintiffs have alleged that SIG Specialists is a wholly-owned subsidiary of SIG LLP and that Susquehanna is SIG LLP's institutional brokerage affiliate. In support of this allegation, Plaintiffs point out that SIG LLP's website states that it is "comprised of several trading and investment related entities under common control, including SIG Specialists, Inc." (Compl.¶ 19(j).) Pursuant to the Second Circuit's holding in *Suez,* these allegations are sufficient to state a Section 20(a) claim against SIG LLP.

■■■ However, there are no such allegations concerning Susquehanna's control over SIG Specialists. Rather, the Complaint merely alleges that Susquehanna: (1) is SIG LLP's international brokerage affiliate, (2) and is affiliated with SIG Specialists. Therefore, Plaintiffs' 20(a) claim with respect to Susquehanna must be dismissed for failure to state a claim.

## F. *Plaintiffs' Motion To Modify The PSLRA Discovery Stay Is Denied As Moot*

On October 1, 2004, Plaintiffs moved to modify the PSLRA discovery stay, which

provides that "in any private action arising under this chapter, all discovery and other proceedings shall be stayed during the pendency of any motion to dismiss, unless the court finds upon the motion of any party that particularized discovery is necessary to preserve evidence or to prevent undue prejudice to that party." 15 U.S.C. § 78u–4(b)(3)(b).

In light of the disposition of the present motions, this motion to modify the discovery stay is denied as moot. Discovery in this case will now proceed.

### Conclusion

Based on the foregoing, it is determined that the Complaint is dismissed with prejudice in its entirety as to NYSE.

The motion to dismiss the Section 10(b) manipulative scheme claim is denied with respect to the Specialist Firms, LaBranche & Co. (for the period August 19, 1999 to October 15, 2003), M. LaBranche (for the period August 19, 1999 to October 15, 2003), and VDM Holding (for the period October 18, 2001 to October 15, 2003). The Section 10(b) manipulative scheme claim is dismissed as to all other Affiliated Companies.

The motions to dismiss the Section 10(b) false and misleading statement claims are denied.

The Section 20(a) claim is dismissed as to Susquehanna. The motion to dismiss the Section 20(a) claim is otherwise denied.

The state law breach of fiduciary duty claims are dismissed with prejudice as to all defendants.

To the extent that claims have not been dismissed with prejudice, leave is granted to replead within thirty (30) days of entry of this Opinion.

It is so ordered.

### Appendix 1

### NYSE Statements Alleged To Be False and Misleading

Plaintiffs allege that the following NYSE statements made during the Class Period are false and misleading.

1. *NYSE Advertisement (featuring testimonial statement by Berkshire Hathaway Inc. CEO Warren E. Buffet)*

Plaintiffs allege the following testimonial statements, which appeared in an advertisement published by NYSE after Berkshire Hathaway, Inc. listed its shares on the NYSE, was false and misleading:

"Berkshire Hathaway listed on the NYSE to reduce shareholder transaction costs. When we switched from OTC to the NYSE, we had high expectations of reducing our transaction costs. Those expectations have been exceeded. A much narrower spread has prevailed on the NYSE than in the over-the-counter market, and we couldn't be more pleased. We wanted the best market we could obtain for our shareholders. The NYSE is that market." [ (Testimonial statement by Berkshire Hathaway, Inc. CEO Warren E. Buffet) ]

The most liquidity. The highest visibility. The fairest pricing. The broadest access to the greatest number of investors. Just a few of the reasons why so many outstanding companies list their shares on the NYSE.

(Compl.¶ 140.)

2. *NYSE Advertisement (featuring testimonial statements by Vivendi Chairman and CEO Jean–Marie Messier)*

Plaintiffs allege the following testimonial statement by Vivendi Chairman and CEO Jean–Marie Messier, which appeared in an

advertisement published by NYSE after Vivendi listed its American depository shares on the NYSE in September 2000, was false and misleading: "Our New York Stock Exchange listing supports the achievement of this objective by giving our shares visibility, credibility, and security in the crucial U.S. capital markets and all around the world." (Compl.¶ 141.)

### 3. December 20, 2002 Statement by NYSE CEO Richard Grasso

Plaintiffs allege that the following statement by NYSE CEO Richard Grasso ("Grasso"), which is alleged to have been made on December 20, 2002 on the television program *Nightly Business Report*, was false and misleading:

> The American public, some 85 million investors strong, don't expect the guarantee of a profit when they enter risk-taking in our capitalist system. What they expect, and what we should absolutely be in a position to deliver always, is a guarantee that their interests will be held first and primary to the interests of those in the intermediation business.

*Nightly Business Report* (Community Television Foundation of South Florida, Inc., Dec. 20, 2002).

### 4. NYSE Brochure ("A Guide To The World's Leading Security Market")

Plaintiffs allege that the following statements from the NYSE brochure entitled "A Guide To The World's Leading Securities Markets" was false and misleading:

> The NYSE provides an efficient, fair, and secure marketplace for investors to trade shares of stock. The NYSE's auction market enables investors to get the best price at the time of the transaction. The auction market represents price improvement at the point of sale, narrow spreads, and accountability to investors

through extensive surveillance, ensuring a fair trading environment.

\* \* \* \* \* \*

NYSE Market Surveillance investigates unusual trading situations. These cases don't include only insider trading, but also violations of auction market procedures, instances when price changes in stocks seem too wide, frontrunning (when a firm trades a stock in advance of issuing a research report), books and records violations, and other violations of rules governing members' on-floor trading.

(Compl.¶ 143.)

### 5. January 18, 2001 Press Release

Plaintiffs allege that the following statement contained in a January 8, 2001 NYSE press release was false and misleading: "Our agency-auction model joins the greatest liquidity and transparency with the most efficient method of price discovery, leading to the lowest execution costs and best prices for customers." (Press Release, NYSE, NYSE · Media Statement re: SEC Report on the Comparison of Order Executions Across Equity Market Structures (Jan. 8, 2001) (*available at* www.nyse.com/audience/media.html).)

### 6. Statement On How NYSE Listing Benefit Non–U.S. Companies

Plaintiffs alleged that the following statement, which appears on the NYSE website, is false and misleading:

> In addition to providing access to the world's largest pool of investors, an NYSE listing provides public companies with the world's most efficient, competitive and equitable marketplace for the trading of their shares. The unmatched quality of the NYSE auction market— the broadest range of investors, the greatest liquidity, the most visibility, the

most efficient and cost-effecting capital-raising process—are often cited as the most compelling reasons to list. Listing on the NYSE also enhances a company's reputation globally, not only among investors but all of its constituents. An Exchange listing also provides the currency for future strategic acquisitions in the U.S.

(N.Y.SE, Information for Listing on the NYSE, *available at* www.nyse.com/audience/listingonthenyse.html (last visited Sept. 14, 2005).)

### 7. *September 28, 1999 Senate Testimony By Grasso*

Plaintiffs allege that the following testimony by Grasso, which was given before the Senate Banking Committee, was false and misleading: "Over the years, the NYSE has served investors well by providing a highly liquid, efficient, and transparent market, with a system of self-regulation that is second to none." (*09/28/99 Hearing On Public Ownership of the U.S. Stock Markets Before The Senate Banking Comm.*, 1999 WL 766067 (prepared testimony of Richard A. Grasso, NYSE Chairman and CEO).)

### 8. *NYSE 2002 Annual Report*

Plaintiffs allege that the following statements from NYSE's 2002 annual report were false and misleading:

Before committing their trust and savings to the market, investors must be guaranteed a fair and level playing field along with equal access to information and guidance they can trust. They require certainty that those entrusted with protecting their interests will do so faithfully—with complete integrity and without compromise. And the people and practices responsible for the crisis of confidence must be thoroughly and permanently rooted out.

\* \* \* \* \* \*

The Exchange's investment in technology has exceeded $2 billion during the past decade. As a result, the NYSE is the world's most technologically advanced equities market, and the most reliable and cost-efficient venue for the trading of equities.

\* \* \* \* \* \*

A total commitment to market quality, innovation and our customers ... While corporate accountability and investor protection took center stage, it did not distract the NYSE from its obligation to provide investors and all market participants with the highest levels of market quality, service and support. Our commitment to continuous innovation and advanced technology produces unparalleled reliability, cost efficiency and productivity. Once again, the Exchange has been recognized as the world's low-cost market for trading services as well as the most liquid and transparent. As a result, ours was the only major U.S. equities market to experience an increase in average daily trading volume—to 1.44 billion shares a day, more than double the daily volume of just five years ago.

To accommodate this growing demand, the Exchange increased data processing capacity by 50%, which boosts available trading capacity to more than five times average daily volume. And with extensive system redundancy and off-site contingency centers in place, our customers can rest assured that the NYSE is well prepared to meet their demanding and complex needs, regardless of circumstance.

(2002 NYSE Annual Report at 2, 4, *available at* www.nyse.com/about.)

### 9. *February 13, 2002 NYSE Press Release*

Plaintiffs allege that the following statements by Grasso in NYSE's February 13, 2002 press release were false and misleading:

It is imperative that we reinforce trust and confidence in our publicly traded companies and in our markets.... [ ]Investors demand and deserve nothing less than timely and accurate disclosure, sound corporate governance, and an established set of practices that ensure transparency and integrity. This is in the best interests of investors, issuers and the markets.

[ ]Are there steps that should be taken to build additional safeguards for investors?[ ] ... [ ]The issues to date have been company-specific, not systemic; but we need to step back and ask what must we do to restore the public's faith. Despite recent failures, our economic system is the most admired in the world and largely driven by investor confidence and public participation. More than 85 million Americans are shareholders. They are not asking for guaranteed profits; they are asking for and deserve guaranteed transparency and a level playing field.[ ]

(Press Release, NYSE, NYSE Appoints Special Board Committee To Advise on Corporate Governance: NYSE Corporate Accountability and Listing Standards Committee (Feb. 13, 2001) (*available at* www.nyse.com/audience/media.html)).

### 10. *April 25, 2002 Statement By Grasso*

Plaintiffs allege that the following statement by Grasso, issued April 25, 2002, was false and misleading: "There is no room in financial markets, nor in financial intermediaries, for those who would put their own interests ahead of those of their customers." (Press Release, NYSE, Statement from NYSE Chairman and CEO Dick Grasso (Apr. 25, 2002) (*available at* www.nyse.com/audience/media.html).)

### 11. *Statements From NYSE Newsletters*

Plaintiffs allege that the following three statements, which appeared in the NYSE newsletter, were false and misleading:

Investors already get the best prices at the NYSE. The challenge is to make the process that delivers those prices increasingly efficient.

\* \* \* \* \* \*

Investors are entitled to the best possible price no matter where their orders originate or are executed. This is a challenge for the entire industry. Our collective goal must be to never forget who we serve: the investor.

\* \* \* \* \* \*

Protecting investors is the NYSE's highest priority.... Through aggressive surveillance and enforcement of our rules and the federal securities laws, our staff works to prevent any individual or firm from betraying our customers' trust and vigorously seeks out and punishes those who do.

(N.Y.SE November 1999 Newsletter (Compl.¶ 150); NYSE December 1999 Newsletter (Compl.¶ 151); Dick Grasso, *The Heart of the Matter,* The Exchange (N.Y.SE, New York, N.Y.), May 2003, at 1. (*available at* http://www.nyse.com/about/publication).[1])

---

1. NYSE's online archive of newsletters spans from January 2003 to the present.

### 12. *NYSE Statement Concerning The Role Of The Specialist*

Plaintiffs allege that the following statements by the NYSE concerning the role and obligations of the specialist were false and misleading:

**The Specialist**

A key feature of the NYSE auction market is the role of the assigned dealer, generally known as the specialist. Specialists are required to perform several specific functions:

- They maintain current bid and asked prices for their assigned stocks. This information is transmitted worldwide, keeping all market participants informed of the total supply and demand for any NYSE-listed stock.

- They act as agents, executing orders entrusted to them by a trading floor broker, such as the limit order. . . .

- When there is a temporary shortage of either buyers or sellers, specialists will buy or sell for their own accounts, against the trend of the market. In recent years, 88 percent or better of specialist trades have been counter to the market trend, helping to balance the immediate supply and demand for a stock. Such activity is not typical of most other markets. . . .

- They act as catalysts, bringing buyers and sellers together, so that offers to buy can be matched with offers to sell. The absolute obligation of the specialists is to place and execute public investor orders ahead of their own—to yield at all times to public orders.

\* \* \* \* \* \*

In recent years, the NYSE has adopted important new measures to assure the continued integrity and competitiveness of its marketplace. . . . Recognizing the imperative of increasing this participation, the NYSE, together with other exchanges and the Securities and Exchange Commission, as addressed specific investor concerns about owning stocks in today's complex investment environment. This includes the rules and regulations necessary to impose some practical limits on volatile price movements within a trading session. It also includes better access to the market in times of unusual activity.

To handle increased volume, the NYSE has strengthened its professional and technological resources. In addition, the flow of information available to investors has been steadily improved, and electronic technology now makes it possible to receive orders, execute trades and report back to investors in less than 30 seconds, a time frame unheard of 10 years ago. New human and technological resources have been devoted, as well, to surveillance and enforcement activities, ensuring that the NYSE market remains the fairest and most open in the world.

(Compl.¶ 153.)

### Appendix 2

### Statements By Specialist Defendants Alleged To Be False and Misleading

### 1. *LaBranche LLC*

The Complaint alleged that the following statements by LaBranche LLC were false and misleading:

When assigned a particular stock, the specialist firm agrees to specific obligations. The specialist firm's role is to maintain, as far as practicable, trading in the stock that will be fair and orderly. This implies that the trading will have reasonable depth and price continuity, so that, under normal circumstances, a customer may buy or sell stock in a manner consistent with market condi-

tions. A specialist firm helps market participants achieve price improvement in their trades because the best bids and offers are discovered through the auction process.

(Compl.¶ 162.)

[A] specialist has a duty to maintain, as far as practicable, a fair and orderly market in its specialist stocks. In order to fulfill its obligations, the specialist must at times trade for its own account, even when it may adversely affect the specialist's profitability. In addition, under some circumstances, the specialist is prohibited from making trades as principal in its specialist stocks. The specialist's obligations are briefly described below.

Requirement to Trade as Principal. A specialist must buy and sell securities as principal when necessary to minimize an actual or reasonably anticipated short term imbalance between supply and demand in the auction market. The specialist must effect these transactions when their absence could result in an unreasonable lack of continuity and/or depth in their specialist stocks. The specialist is not expected to act as a barrier in a rising market or a support in a falling market, but must use its own judgment to try to keep such price increases and declines equitable and consistent with market conditions.

A specialist must make firm and continuous two-sided quotations that are timely and that accurately reflect market conditions. In making these quotations, the specialist's transactions are calculated to contribute to the maintenance of price continuity with reasonable depth. Following is an illustration of how a specialist acts as principal to maintain price continuity . . .

* * * * * *

Trading Restrictions. In trading for its own account, the specialist must avoid initiating a market-destabilizing transaction. All purchases and sales must be reasonably necessary to permit the specialist to maintain, as far as practicable, a fair and orderly market in its specialist stocks. In addition, the specialist must comply with the following trading requirements:

- A specialist must first satisfy a customer's market buy order (an order to buy at the prevailing market price) before buying any stock for its own account. Similarly, a specialist must first satisfy a customer's market sell order (an order to sell at the prevailing market price) before selling any stock for its own account.

- A specialist must first satisfy a customer's limit order held by it before buying or selling at the same price for its own account. A limit order is an order either to buy only at or below a specified price, or to sell only at or above a specified price. A specialist may not have priority over any customer's limit order. A specialist, however, may buy or sell at the same price as a customer limit order as long as that limit order is executed first.

- If a public buyer wants to buy at a particular price and a seller wants to sell at the same price, the buyer and seller trade directly with each other, and the specialist should not interfere in the transaction.

- The specialist does not charge commissions for trades in which it acts as a principal.

- Except in some circumstances in less active markets, the specialist may not, without permission from an NYSE official, initiate destabilizing trades for its own account which cause the stock price to rise or fall.

- Any transactions by the specialist for its own account must be effected in a reasonable and orderly manner in relation to the condition of the general market, the market in the particular stock and the adequacy of the specialist's position to the immediate and reasonably anticipated needs of the market.

(Compl. ¶ 168; 06/18/99 Form S–1 Registration Statement, at 41, 42; 03/30/00 Form 10–K, at 9–10; 03/30/01 Form 10–K, at 13–15; 03/15/02 Form 10–K, at 13–15.)

As a NYSE Specialist, LaBranche plays an essential role in the auction market system. We act as agent, auctioneer, catalyst and principal. From its posts on the floor of the NYSE, the firm takes a proactive role in bringing together buyers and sellers, all the while fulfilling its obligation to maintain fair and orderly markets in the stocks it trades.

(*Id.* ¶ 169; LaBranche & Co., 2000 Annual Report 4–5 (2001).)

Against a backdrop of an economy in recession and a substantial downward adjustment in the valuation of world equity markets, we remained solidly profitable while providing customers with the most transparent, fair and liquid markets anywhere.

\* \* \* \* \* \*

As Specialist, we hold a unique position in the auction market system, bringing together buyers and sellers and meeting our obligation to maintain fair and orderly markets in the stocks we trade.

(*Id.* ¶ 170; LaBranche & Co., 2001 Annual Report 1,5 (2002).)

"The march of technological change has enabled us to consistently improve the quality of execution—which means faster, lower-cost transactions with greater price transparency—and to bring the investor ever closer to the point of sale."

\* \* \* \* \* \*

For us, technology is an essential tool in helping us fulfill one of our fundamental missions: to continually improve the quality of transaction execution.

\* \* \* \* \* \*

LaBranche engaged in numerous initiatives designed . . . to lead the way in helping to create market environments that deliver superior execution to the investing community.

(*Id.* ¶ 171; LaBranche & Co., 2002 Annual Report 2,8,11 (2003) (quoting M. LaBranche).)

LaBranche is committed to providing the most efficient stock executions utilizing cutting-edge technology. We are supportive of initiatives that enable the Specialist to execute with greater certainty when best price is still attained as a result. It is our goal to enhance the capability of our customers to access the vast pools of liquidity in our markets. In the long run, market quality and the cost of execution will determine the most successful market structure. We believe that our auction market, with the Specialist playing an important role, will continue to be the best market in the future. We believe that LaBranche is well positioned to benefit from the many changes taking place and, as always, will work to best maximize your investment.

\* \* \* \* \* \*

The Specialists of LaBranche play a pivotal role in the functioning of the auction market that is at the heart of the NYSE. The auction market structure, which distinguishes the NYSE from other major equity markets, is considered among the world's most efficient market environments. At the NYSE, the auction market allows all participants, whether large

or small, to interact in the marketplace in a fair way. The LaBranche Specialist is charged with maintaining fair, competitive and orderly trading. Combining human judgment, our firm's own capital, and advanced technology, our Specialists help create a trading environment that has become the most successful equity marketplace in the world.

(*Id.* ¶ 172; LaBranche & Co., 2003 Annual Report 3,4 (2004))

"LaBranche & Co. fully recognizes and understands its role as the largest Specialist firm at the NYSE. In that regard, LaBranche & Co. has always held itself and its specialists to the highest standards. Our specialists have always focused on putting its customers first, as proven by the superior price improvement that our specialists provide to our customers on a daily basis. LaBranche & Co. has always been committed to the regulatory framework of the NYSE and has responded promptly to any area of regulatory concern."

(*Id.* ¶ 173; Press Release, LaBranche & Co., LaBranche & Co. Issues Statement Regarding Wall Street Journal Article (Apr. 17, 2003) (quoting M. LaBranche).)

"We work diligently to make sure our customers are getting the best prices available. . . . It is our priority to make sure their interests are protected."

(*Id.* ¶ 174; Philip Boroff, *Specialist Firms Scrutinized By NYSE*, Wash. Post, Apr. 18, 2003, at E2 (quoting M. LaBranche).)

### 2. *LaBranche & Co. And NYSE*

The Complaint alleges that the following statements are attributable to both LaBranche & Co and NYSE:

Good morning, I am Bob Murphy, New York Stock Exchange specialist with LaBranche & Company as well as New York Stock Exchange Director and Vice

Chairman of the board. . . . Specialists on the New York Stock Exchange are accountable to the investing public, for the quality of NYSE markets and their specialty stocks. This means that the specialist is responsible for fostering and maintaining liquidity and continuing two-sided auction markets on the NYSE floor. The specialist plays a pivotal role in insuring that investor orders receive the best possible execution. To accomplish this, specialists act both as agent and principal in their specialty stocks, to help insure that markets for those stocks are fair and orderly, and that they operate efficiently in the public interest. The NYSE specialist is the focal point of the auction price discovery process. The specialist's primary job is to bring buyers and sellers together in an efficient and orderly manner to provide transparency and liquidity and to maximize the opportunity for public buy and sell orders to interact without getting between them.

The NYSE specialist has an affirmative obligation to step in and step up when no one else wants to. The specialist buys or sells as principal when necessary to minimize short-term imbalances between supply and demand. In this way, the specialist provides depth and price continuity, minimizes volume at this time in the auction market. In addition, the specialist has a negative obligation. The specialist may not trade for a proprietary account unless reasonably necessary to maintain a fair and orderly market.

\* \* \* \* \* \*

The industry has changed quite a bit since I first came to Wall Street and not all for the better. I am concerned about a number of anticustomer practices that I see in the industry today. Dealers in other markets cherry pick the easiest

orders of the least informed customers and execute those orders at prices discovered at the NYSE while NYSE specialists stand ready to accept all orders of all customers, including the offsetting orders of the cherry pickers. Agents for customers receive payment for their customer orders. Agents for customers trade against orders for their customers, without giving those orders a chance to interact with other orders of public customers. Dealers in other markets disseminate non-competitive quotes, thereby shunning the responsibility to make markets for all, while still guaranteeing significant order flow.

An exchange buys reports of off-exchange trades from OTC dealers and ECNs and fraudulently prints those off exchange trades as though they have actually taken place on that exchange. An ECN hides quotes and its participants ignore better priced orders on other markets.

Regaining investor confidence is crucial to the continued preeminence of our secondary markets, yet we have allowed to creep into our markets practices in which dealers and even agents put their own interests ahead of the interests of their customers. The NYSE trading model precludes these anti-investor practices by the very way that it has evolved. We integrate the trading of institutional and retail orders into a single auction and we apply automation to the extent consistent with that integration. This provides investors with optimal price discovery and maximum flexibility. Other markets take different approaches, but whatever model a market may choose, the Commission should not permit it to embody those anti-investor practices—and that requires the Commission to attack the root causes of those practices.

\* \* \* \* \* \*

[W]e believe Congress got it right in 1975 when it determined that transparency was the heart of effective intermarket competition and when it bounded intermarket competition by the principle that dealers should only intervene as a last resort, thus, we support all markets disseminating as much as is possible, trading interests disclosed at the point of sale. We support maximizing the opportunities for customer orders to interact directly within a market so that the particular participants to a trade receive best execution and all market participants receive the benefits of optimal price discovery.

Let's place the customer first....

(Compl. ¶¶ 177–79 (quoting Murphy at Nov. 12, 2002 SEC Hearing).)

### 3. *Spear Leeds LLC*

Plaintiffs have alleged that the following statements by Spear Leeds LLC are false and misleading:

**What is the role of a Specialist?**

Specialists are responsible for maintaining a liquid and continuous two-sided auction market by acting as both an agent and a principal. Specialists ensure that markets are fair, orderly and competitive.

**What are the primary responsibilities of a Specialist?**

Specialists are required to make continuous two-sided quotations that accurately reflect prevailing market conditions. In performing this function, Specialists can act as both an agent and a principal. When acting as agent, Specialists match the orders of buyers and sellers, thus ensuring timely execution at the best available price. Specialists have a Neg-

ative Obligation to provide an opportunity for public orders to be executed against each other without undue intervention.

Occasionally, it's not possible to match buy and sell orders due to a short term imbalance between supply and demand for a company's shares. Under those circumstances, Specialists will act as principal.

When acting as principal, Specialists have an Affirmative Obligation to buy and sell securities in order to maintain price continuity with reasonable market depth . . . .

(Compl.¶ 155.)

Since 1931, Spear, Leeds & Kellogg Specialists LLC has been committed to this simple, yet vital principle.

As of April 30, 2005, SLKS proudly serves as specialist for 558 NYSE-listed companies. Our portfolio is comprised of the most prestigious domestic and international companies, built one relationship at a time. SLKS clients benefit from our high standard of trading excellence, our significant capital position and our unique relationship with our parent, Goldman Sachs Group.

At SLKS, we are committed to building meaningful relations based upon mutual respect and trust, to providing our clients with comprehensive, relevant, useful information, and to making fair, orderly and liquid markets.

(Spear Leeds LLC, *Our Clients Always Come First, available at* http://www.slk.com (last visited Sept. 14, 2005).)

Integrity and honesty are at the heart of our business. We expect our people to maintain high ethical standards in everything they do, both in their work for the firm and in their personal lives.

(Spear Leeds LLC, *Our Business Principals, available at* http://www.slk.com (last visited Sept. 14, 2005).)

### 4. *VDM Specialists*

The Complaint attributes no false or misleading statements to VDM Specialists.

### 5. *Fleet Specialist*

Plaintiffs have alleged that the following statements by Fleet Specialist were false and misleading:

All customers, whether individual or institutional, must have an equal opportunity to interact and receive the best price. This premise is at the heart of an auction market and at the heart of the specialist's role. Our specialists focus on cushioning volatility. They act like shock absorbers to ensure trade-to-trade price continuity in either direction. A specialist sells on the upswing and buys on the downturn in order to create a fair, competitive, orderly and efficient market for the protection of shareholders.

\* \* \* \* \* \*

The specialist is also the agent representing all SuperDot (electronically routed) orders and for investors who place orders with brokers specifying price limits at which they are willing to trade . . . .

(Compl.¶ 159.)

A member of the stock exchange charged with maintaining fair and orderly markets, providing liquidity and stability to the securities he is assigned. Primary among the specialist's responsibilities are a) maintaining the published quote, b) acting as agent for customers' orders, c) as principal, buying or selling for his own account against the market trend and d) acting as a catalyst, provid-

ing accurate, timely information in order to bring buyers and sellers together. (Compl.¶ 160.)

Specialists are the bridges between buyers and sellers, shares and shareowners, issuers and investors, and they help to maintain the New York Stock Exchange's place among the world's most efficient and yet lucrative markets.

\* \* \* \* \* \*

According to NYSE regulations, the specialist must always buy or sell against the current market trend, meaning the specialist can only buy when the stock is moving down and sell when it's moving up, which, once again, takes some of the volatility out of the market.

\* \* \* \* \* \*

The specialist can't just throw his hands into the air and say, "I'm going to lose money if I make this trade—I'm going to just walk away." He is obliged to participate even when he knows the average investor wouldn't do so. His first responsibility is to the market and his second responsibility is to his own portfolio.

\* \* \* \* \* \*

As reinforced by stringent NYSE regulations, the specialist may only step in to buy or sell when it is necessary to do so. That is, if there is a natural match between buyer and seller, the specialist stays out of the trade unless there is the opportunity to improve the price for either the buyer or the seller. (Compl.¶ 161.)

### 6. *Fleet Specialists And NYSE*

The Complaint alleges that the following allegedly false and misleading statements can be attributed to both Fleet Specialists and NYSE:

On the New York Stock Exchange we put customers to customers 85 percent of the time, no dealer intervention. That's what creates frictionless trading on the New York Stock Exchange, no displacements, volatility profiles are lower than other markets, This is what we have been selling all these years, continues—it continues with innovation, it continues with technology wrapped around it, but the New York Stock Exchange is no different than any trading room on Wall Street . . . . the New York Stock Exchange, by not only being responsible for both sides of the transaction, the sell side and the buy side; not just adhering to one side of the transaction while discrediting the other side of the transaction. So this customer to customer, the constant flow is begetting liquidity, and that's why we do 84 percent of the volume listed trades. . . . I think it has been proven that when customers meet customers, a better price is achieved by the customer.

\* \* \* \* \* \*

And by having time priority, the customer, again, is served best because he is shown that liquidity gets interacted with. . . . I am acting as a dealer and as an agent. I step aside when an order comes in at that price. I don't trade as a dealer at that price until the customer is satisfied . . . . there are other orders that interact other institutional orders at some time at the point of sale in the auction process. And there is time priority. . . . But the rules are the rules, that's why the NYSE has been so successful because of the standards and rules that our SRO and our market surveillance staff and enforcement division carry out. The exchange is not run by the members. The exchange is run by a board comprised of twelve industry people, twelve outside directors that repre-

sent industries, and we have three management directors on the board.

(Compl. ¶¶ 180–81 (quoting Quick at November 12, 2002 SEC hearing)).

### 7. *Bear Wagner LLC*

Plaintiffs have alleged that the following statements by Bear Wagner LLC are false and misleading:

Specialists manage the auction market in the specific securities allocated to them. They must maintain a fair, competitive, orderly and efficient market at all times, even in those market conditions considered extreme. This means that all customer orders have an equal opportunity to interact and receive the best price on execution. Bear Wagner Specialists prides itself on our ability to maintain exceptional markets in the stocks we trade in all market conditions, even in the most difficult and volatile periods of market activity.

\* \* \* \* \* \*

The specialist acts as agent for all electronically-routed orders. A floor broker may also choose to leave an order with a specialist to represent it, in which case the specialist is acting as agent for the broker's order. As agent, the specialist assumes the same fiduciary responsibility as a broker.

(Compl.¶ 157.)

As trusted advisor and strategic partner to many of the world's most recognized brands, we bring vast experience and resources to companies joining the NYSE. Our advanced trading technology and financial strength ensure optimal levels of liquidity and capital support. Bear Wagner puts a team of 340 professionals to work on our clients' behalf. We are proud to be an extension of our 370 listed companies—accountable to

them and committed to achieving market excellence.

(Bear Wagner LLC, *Bear Wagner Corporate Profile* (Updated September 2005), *at* http://www.bearwagner.com/are.html.)

### 8. *SIG Specialists*

The Complaint alleged that the following statements by SIG Specialists were false and misleading:

The fundamental responsibility of a specialist on the New York Stock Exchange is to manage efficiently the trading of a company's shares, rapidly pairing off buyers and sellers while seeking the fairest possible execution for all parties involved. In the service of its listed companies, a specialist must also serve as a liquidity provider and a source of stability, at the same time offering information, insight and market commentary.

(Compl.¶ 164.)

SIG's substantial capital resources support SSI's ability to provide reliable liquidity, enhancing stability and continuity in the stock price. As a result, we can be more aggressive in accommodating customer and market risk than other specialist firms.

(SIG LLP, *Our Role as Specialist, at* http://www.sig.com/markets/specrole.html (last visited Sept. 14, 2005).)

### 9. *Performance Specialist*

The Complaint alleged that the following statements by Performance Specialist were false and misleading:

Specialists must maintain a fair, competitive, orderly and efficient market. This means that all customer orders have an equal opportunity to interact and receive the best price. It also means that once auction trading begins, a customer should be able to buy or sell a reasonable amount of stock close to the last sale. Therefore, a specialist works to

avoid large or unreasonable price variations between consecutive sales. The results: almost 98% of all trades take place at 1/8th point or less from the last sale.

\* \* \* \* \* \*

A specialist is the agent for all SuperDot (electronically routed) orders. A floor broker may also choose to leave an order with a specialist to represent it until it can be executed at a specified price. This allows brokers to concentrate on other orders that require their immediate attention. As an agent, a specialist assumes the same fiduciary responsibility as a broker.

\* \* \* \* \* \*

In order to fulfill their role, specialists agree to several obligations. The first is to place and execute all customer orders ahead of their own. . . .

\* \* \* \* \* \*

As principal, specialists supply the short-term liquidity for the market. Buying or selling against the trend, specialists help to reduce volatility and stabilize the market. . . .

\* \* \* \* \* \*

As auctioneer, agent, catalyst and principal, specialists make a continuous market in a stock from the opening to the closing bell, insuring that shareholders have the opportunity to buy and sell stock as close to the last sale as possible.

(Compl. ¶ 163.)